12-3492

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

Alejandro Palomar, Sr              )
Rafaela Palomar                 )
      Plaintiff-Appellants     )
                               )
      v.                       )
                               )
First American Bank           )
      Defendant-Appellee      )
                               )
                               )

---

Appeal from the United States District Court
for the Northern District of Illinois
Honorable Gary S. Feinerman, Judge Presiding
District Court No. 12-cv-02418

---

## BRIEF OF PLAINTIFF-APPELLANTS
## ALEJANDRO AND RAFAELA PALOMAR

---

Attorneys for *Plaintiff-Appellants*
Nathan E. Curtis
Jonathan D. Parker
Peter Francis Geraci
Geraci Law L.L.C.
55 E. Monroe, Suite 3400
Chicago, IL  60603
312-499-6201

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 12-3492

Short Caption: Alejandro Palomar v. First American Bank

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Alejandro Palomar, Sr., Plaintiff/Appellant

Rafaela Palomar, Plaintiff/Appellant

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Geraci Law L.L.C.

(3) If the party or amicus is a corporation:

    i) Identify all its parent corporations, if any; and

    N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

    N/A

Attorney's Signature: /s/ Nathan E. Curtis      Date: 12/10/2012

Attorney's Printed Name: Nathan E. Curtis

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes**   X    **No** _____

Address: 55 E. Monroe Street # 3400

Chicago, IL 60603

Phone Number: 312-499-6201      Fax Number: 877-247-1960

E-Mail Address: nat@geracilaw.com

rev. 01/08 AK

i

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __12-3492_____

Short Caption: __Alejandro Palomar v. First American Bank_____

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

     Alejandro Palomar, Sr., Plaintiff/Appellant

     Rafaela Palomar, Plaintiff/Appellant

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

     Geraci Law L.L.C.

(3)   If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

       N/A

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

       N/A

Attorney's Signature: __/s/ Jonathan D. Parker_____  Date: __12/10/2012_____

Attorney's Printed Name: __Jonathan D. Parker_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** ☒

Address: __55 E. Monroe Street # 3400_____

        __Chicago, IL 60603_____

Phone Number: __312-499-6201_____    Fax Number: __877-247-1960_____

E-Mail Address: __par@geracilaw.com_____

                                                          rev. 01/08 AK

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __12-3492_____

Short Caption: __Alejandro Palomar v. First American Bank_____

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]       PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   __Alejandro Palomar, Sr., Plaintiff/Appellant_____

   __Rafaela Palomar, Plaintiff/Appellant_____


(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   __Geraci Law L.L.C._____

   _____

   _____


(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

      __N/A_____

   ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

      __N/A_____


Attorney's Signature:  __/s/ Peter Francis Geraci_____   Date:  __12/10/2012_____

Attorney's Printed Name:  __Peter Francis Geraci_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** __☒__

Address:   __55 E. Monroe Street # 3400_____

      __Chicago, IL 60603_____

Phone Number:  __312-499-6201_____   Fax Number:  __877-247-1960_____

E-Mail Address:  __pgeraci@geracilaw.com_____

rev. 01/08 AK

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ….………………………………..i

TABLE OF CONTENTS …………………………..……………………………iv

TABLE OF AUTHORITIES ………………….……………………………….vii

STATEMENT REGARDING ORAL ARGUMENT ……………….…………  xii

JURISDICTIONAL STATEMENT ……………………………………………1

STATEMENT OF THE ISSUES PRESENTED ……………………………….2

STATEMENT OF THE CASE ………………………………………………….2

STATEMENT OF FACTS …………………………………………………….3

SUMMARY OF ARGUMENT ……………………………………………….4

STANDARD OF APPELLATE REVIEW ……………………...……………..5

ARGUMENT …………………………………………………………………...5

I.    The Bankruptcy Court erred in dismissing the Palomars'
      adversary proceeding based on the lack of subject matter
      jurisdiction …………………………………………………………….5

II.   The Bankruptcy Court Erred in Ruling a Wholly Unsecured
      Junior Mortgage Could not be Voided in a Chapter 7 …………………8

      A.    Liens and Bankruptcy in Historical Context …………………… .8

            A-1.   *Dewsnup v. Timm* …………………………………………10

            A-2.   *Nobelman v. American Savings Bank* ………………….12

            A-3.   *Associates Commercial Corp. v. Rash* ………………..14

      B.    Sections 506(a) and (d) Permit the Palomars to
            Strip off First American Bank's Wholly Unsecured
            Junior Mortgage Lien ………………………………………15

B-1.    Section 103(a) of the Bankruptcy Code
Requires that Sections 506(a) and (d) Apply
Equally to Chapters 7, 11, 12 and, 13 ..........................18

B-2.    Other Provisions in the Bankruptcy Code
Support the Position that Section 506(d)
is Used to Avoid Liens ............................................20

B-3.    The Public Policy Embedded in the Bankruptcy
Code of Giving Debtors a Fresh Start Requires
that this Court Grant the Palomars Relief .................21

C.    Lien Stripping in the Reorganization Chapters of the
Bankruptcy Code ............................................................22

D.    Lien Stripping in Chapter 7 Proceedings ............................24

D-1.    *Dewsnup* Does Not Bar the Relief that the
Palomars Seek ......................................................25

D-2.    Courts that Extend the Holding of *Dewsnup*
to Disallow Chapter 7 Debtors from Stripping
Off Wholly Unsecured Liens Misread and
Misapply the Holding of *Dewsnup* ............................28

D-3.    Courts that Limit *Dewsnup* to its Facts and
Allow Chapter 7 Debtors to Strip Off Wholly
Unsecured Mortgages Correctly Read both
*Dewsnup* and Sections 506(a) and (d) ........................34

E.    The Bankruptcy Court's Decision Below was
Erroneous for Two Additional Reasons ...............................36

E-1.    The Bankruptcy Court Drew an Impermissible
Distinction Between Asset and no-Asset
Chapter 7 Cases ....................................................36

E-2.    The Claims Allowance Process is not a
Necessary Condition to Avoiding a Lien
using Section 506(d) ...............................................38

CONCLUSION ...................................................................40

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ...........................42

CERTIFICATE OF SERVICE ...............................................................43

CERTIFICATE OF COMPLIANCE WITH RULE 30(d) ..........................44

APPENDIX TABLE OF CONTENTS......................................................45

# TABLE OF AUTHORITIES

## CASES

*Associates Commercial Corp.*
*v. Rash*, 520 U.S. 953 (1997)………………………………...10, 14, 18, 19, 29, 30

*In re Bartee*, 212 F.3d 277 (5th Cir. 2000)…………………………………………22

*In re Caliguri*, 431 B.R. 324 (Bankr. E.D. NY. 2010)………………………24, 25

*Chapman v. Currie Motors, Inc.* 65 F.3d. 78, 81 (7th Cir. 1995)…………….7

*City of Richmond v. Bird*, 249 U.S. 174 (1919)…………………………………8

*In re Dever*, 164 B.R. 132 (Bankr. C.D. Cal. 1994)…………………………11, 19

*Dewsnup v. Timm*, 502 U.S. 410 (1992)……..4, 8, 9, 10, 11, 12, 16, 17, 25, 29

*Doyle v. Time Warner Cable*, 516 U.S. 1141 (1996)……………………………15

*In re Franklin*, 126 B.R. 702 (Bankr. N.D. Miss. 1991)………………………21

*In re Frederickson,* 545 F.3d 652 (8th Cir. 2008)…………………………………15

*In re Geyer*, 203 B.R. 726, 729-30 (Bankr. S.D. Cal. 1996)………………...29

*Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)…………………………………...21

*In re Griffey*, 335 B.R. 166 (B.A.P. 10th Cir. 2005)………………………………23

*Hares v. Sage Financial*, 431 B.R. 796 (S.D. Oh. 2010)…………………………25

*Harmon v. US Through Farmers Home Admin.*,
101 F. 3d 574 (8th Cir. 1996)……………………………………………...11, 12, 19

*In re Hill*, 440 B.R. 176, 180-81 (Bankr. S.D. Cal. 2010)………………………32

*Holloway v. United States*, 2001 WL 1249053 (N.D.Ill. Oct.16, 2001)……...22

*In re Immel*, 436 B.R. 538, 543 (Bankr. N.D. Ill. 2010)………………25, 36, 37

*In re Kimball Hill, Inc.*, 480 B.R. 894 (Bankr. N.D. Ill. 2012)……….………26

*In re Lane*, 280 F.3d 663 (6th Cir. 2002)................................................22

*Lamie v. U.S. Trustee*, 540 U.S. 526 (2004)........................................31

*In re Laskin*, 222 B.R. 872, (9th Cir. B.A.P. 1998)...........................28, 31

*In re Lavelle* 2009 WL 4043089 (Bankr. E.D. NY. 2009)....................34, 35

*Long v. Bullard*, 117 U.S. 617 (1886)....................................................8, 9

*In re Mann*, 249 B.R. 831 (B.A.P. 1st Cir. 2000)....................................23

*Matter of Tarnow*, 749 F. 2d 464 (7th Cir. 1984)................................9, 40

*In re McDonald*, 205 F.3d 606 (3rd Cir. 2000)..................................22, 23

*In re McNeal* 2010 WL 1753376 (Bank. N.D. Ga. 2010)
*rev'd*, 477 Fed. Appx. 562 (11th Cir. 2012)............................................28

*In re McNeal,* 477 Fed. Appx. 562, 564 (11th Cir. 2012).....................26, 33

*Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994)..............................5

*Milner v. Dep't of Navy*, 131 S.Ct. 1259, 1266 (2011)............................17

*Nobelman v. American Savings Bank*, 508 U.S. 324 (1993).....9, 10, 12, 13, 14, 18, 19, 23, 24, 29, 30

*Negonsott v. Samuel*, 507 U.S. 99 (1993).....................................20, 32, 40

*In re Pepper*, 210 B.R. 480 (Bankr. D. Colo. 1997)..................................27

*Pomilio v. MERS et al.*, 425 B.R. 11 (E.D. NY. 2010)..............................24

*In re Pond*, 252 F.3d 122 (2nd Cir. 2001)..............................................22

*In re Repository Technologies, Inc.*, 601 F.3d 710, 719 (7th Cir. 2010)........7

*In re Ryan*, 253 F. 3d. 778 (4th Cir. 2001) ......................................28, 31

*In re Smoot*, 2011 WL 5240365 (Bankr. E.D.N.Y. 2011)
*rev'd*, 478 B.R. 555 (E.D. N.Y. 2012)...............................33, 34, 35, 36, 38

*In re Statistical Tabulating Corp. Inc.*, F.3d 1286, 1289 (7th Cir. 1995).......7

*Stern v. Marshall*, 131 S.Ct. 2594, 2605 (2011)..........................................7

*In re Talbert*, 268 B.R. 811, 815 (Bankr. W.D.Mich. 2001)
*aff'd*, 344 F.3d 555 (6th Cir. 2003) ......................................................40

*In re Talbert*, 344 F.3d 555 (6th Cir. 2003) ...................................…..28, 31

*In re Tanner*, 217 F.3d 1357 (11th Cir. 2000)...................................22, 23

*Toibb v. Radloff*, 501 U.S. 157 (1991)......................................................15

*Warthen v. Smith*, 247 B.R. 191 (W.D. Va. 2000)...................................39

*In re Waters*, 276 B.R. 879 (N.D. Ill. 2002)...........................................22

*In re Woolsey*, 696 F.3d 1266 (10th Cir. 2012) .......................................22

*United Sav. Ass'n of Texas v. Timbers of Inwood
Forest Assocs. Ltd.*, 484 U.S. 365, 371 (1988) .......................................20

*In re Yi*, 219 B.R. 394, 397 (E.D. Va. 1998)............................….........26

*In re Zimmer*, 313 F.3d 1220 (9th Cir. 2002)....................................22, 24

# STATUTES AND RULES

11 U.S.C. § 103(a).....................................................18, 19, 30, 31, 32, 40

11 U.S.C. § 349(b)(1)(C) ...................................................................20

11 U.S.C. § 350(b) .............................................................................8

11 U.S.C. § 502(a).....................................................................36, 38, 39

11 U.S.C. § 506(a).........................9, 10 ,11, 12, 13, 14, 15, 16, 17, 18, 19, 21
                                       22, 23, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35

11 U.S.C. § 506(d).........................2, 4, 5, 9, 10, 12, 15, 17, 18, 19, 20, 21, 23,
                                       24, 26, 29, 30, 32, 34, 38, 40

11 U.S.C. § 522(c)(2)(A)(ii) ...............................................................20

11 U.S.C. § 522(f)........................................................................27, 30

11 U.S.C. § 551 ................................................................................20

11 U.S.C. § 704(a) ...........................................................................38

11 U.S.C. § 722 ................................................................................33

11 U.S.C. § 1123(b)(5)................................................................18, 19

11 U.S.C. § 1322(a)(4)......................................................................35

11 U.S.C. § 1322(b)(2)......................................10, 13, 18, 19, 23, 31, 32, 34

11 U.S.C. § 1325(a)(5)(B) ...............................................14, 17, 23, 31

28 U.S.C. § 157(a) ........................................................................1, 6

28 U.S.C. § 157(b)(1) .........................................................................1

28 U.S.C. § 157(b)(2) .........................................................................1

28 U.S.C. § 158(a)(1) .........................................................................1

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1334(a) ................................................................6

28 U.S.C. § 1334(b) .............................................................1, 6

Fed.R.Bankr.P. 3007(b) ......................................................39

Fed.R.Bankr.P. 7001(2)........................................................39

Fed.R.Bankr.P. 7004 .............................................................3

Fed.R.Bankr.P. 8002 .............................................................1

## OTHER AUTHORITIES

H.R. REP 95-595, H.R. Rep. No. 595, 95th Cong.,
1ST Sess. 1977, 1978 U.S.C.C.A.N. 5963, 1977 WL 9628 .....................17, 21

*Michael Myers*, *Dewsnup Strikes Again: Lien-Stripping
of Junior Mortgages in Chapter 7 and Chapter 13*,
53 Ariz. L. Rev. 1333, 1357 (2011) ........................................... 33

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellants, Alejandro and Rafaela Palomar, respectfully request oral argument in this case.  The issue is one that has generated considerable controversy in the field of consumer bankruptcy and has enormous consequences for many thousands of debtors. The importance of this issue requires this Honorable Court be fully advised as to the facts of the instant case, the opposing legal arguments, and the potential consequences of its ruling.

## JURISDICTIONAL STATEMENT

The adversary proceeding below arose in a case under Title 11 U.S.C. and was a core proceeding under 28 U.S.C. § 157(b)(2). The Bankruptcy Court's jurisdiction was based on 28 U.S.C. § 157(a), § 157(b)(1) and § 1334(b) and internal operating procedure 15(a) of the Northern District of Illinois, referring to bankruptcy judges all proceedings arising in or related to a case filed under Title 11. The Bankruptcy Court entered a final order on January 24, 2012, dismissing the adversary proceeding.  On January 25, 2012, the Plaintiff-Appellants (hereinafter "the Palomars") timely filed their Notice of Appeal to the District Court pursuant to Federal Rule of Bankruptcy Procedure 8002. The District Court had jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a) because the District Court proceedings were an appeal from a final judgment of the United States Bankruptcy Court. On October 3, 2012, the District Court entered a final order affirming the Bankruptcy Court's judgment and the Palomars timely filed their Notice of Appeal on October 29, 2012.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which grants the Court of Appeals jurisdiction over all final decisions of the District Court.

## STATEMENT OF THE ISSUES PRESENTED

Can a chapter 7 debtor use section 506(d) of the Bankruptcy Code to void a wholly unsecured junior mortgage lien on the debtor's primary residence?

## STATEMENT OF THE CASE

The Palomars filed for protection under chapter 7 of the Bankruptcy Code on July 27, 2011. (Appx. at 26.) On August 25, 2011, the duly appointed Chapter 7 Trustee issued a "no asset report" indicating that there was nothing of value to the Palomars' bankruptcy estate that could be liquidated for the benefit of the Palomars' unsecured creditors. (Appx. at 26.) On November 28, 2011, the clerk of the bankruptcy court entered a discharge of the Palomars' dischargeable debts.  The Palomars' bankruptcy case closed administratively on December 1, 2011. (Appx. at 26.)

On August 24, 2011, well before the entry of a discharge and the closing of the underlying bankruptcy case, the Palomars filed an adversary proceeding against First American Bank. (Appx. at 27.) In their complaint, the Palomars sought a determination of the nature and extent of the lien purportedly held by the Defendant-Appellee (hereinafter "First American Bank"). To the extent that there was no value supporting First American Bank's lien, the Palomars sought to have the lien declared void pursuant to 11 U.S.C. § 506(d).

2

The Palomars properly served First American Bank pursuant to Federal Rule of Bankruptcy Procedure 7004(b)(3). First American Bank failed to file an answer or to otherwise plead. As a result, the Palomars filed a motion for default and for default judgment. The Bankruptcy Court asked for the Palomars to file a brief in support of their motion. The Palomars did file such a brief, and the Bankruptcy Court took the matter under advisement. On January 24, 2012, the Bankruptcy Court issued a written decision denying the Palomars' motion for default and default judgment and dismissing the adversary complaint. On January 25, 2012, a timely Notice of Appeal was filed to the District Court and on October 3, 2012, the District Court entered an order affirming the judgment of the Bankruptcy Court. (Appx. at 32-36.)  A timely Notice of Appeal was filed October 29, 2012.

## STATEMENT OF FACTS

The Palomars own a home located at 1937 S. Clinton Ave., Berwyn, IL 60402. (Appx. at 2.) This property is the Palomars primary residence. (Appx. at 2.)  At the time of the petition, the property had a fair market value of $165,000. (Appx. at 2, 7.)  This residence was subject to two mortgages. (Appx. at 2-3.) A first mortgage held by LBPS with a principal balance of $242,894.83 and a second mortgage held by First American Bank with an unknown balance (but with an original loan amount of $50,000). (Appx. at 2-3.) The amount due on the first mortgage is greater than the value of the property.  There is no value in the property to support the second mortgage.

## SUMMARY OF ARGUMENT

The Bankruptcy Court erred in dismissing the Palomars' adversary complaint against First American Bank. Although the underlying chapter 7 was closed during the pendency of the adversary, the Court should have chosen to retain jurisdiction, and indicated it may have if the Palomars had requested relief that was available to them. The Court erred in determining that relief was not available to them because 11 U.S.C. § 506(d) can be used to void a wholly unsecured junior mortgage.

Although the Supreme Court previously interpreted 11 U.S.C. § 506(d) in a chapter 7 bankruptcy, the Court expressly limited that opinion to the specific fact pattern raised in that case: an attempt to "strip down" a partially secured junior mortgage. *Dewsnup v. Timm*, 502 U.S. 410, 416-7 (1992). The facts in the instant case differ, as it concerns a wholly unsecured junior mortgage; one to which there is absolutely *no* security for a lien to attach.

Examining the Bankruptcy Code as a whole, there are several statutes that bolster the argument that section 506(d) can be used to void liens. Following the rationale of the Bankruptcy Court and the other Courts who reached similar decisions would completely ignore the plain language of those other statutes. Furthermore, permitting the Palomars to void their wholly unsecured second mortgage and giving them a fresh start would enforce the primary purpose of the Bankruptcy Code.

The vast majority of Courts that have examined the issues have permitted wholly unsecured junior mortgages to be stripped in the reorganization chapters of the Code. The minority of Courts who allow chapter 7 debtors to void these liens recognize that in order to give meaning to all applicable statutes, and reconcile them with existing case law, it must be possible to void these mortgages and the way to do that is with section 506(d).

The argument set forth by the Bankruptcy Court that a claims allowance process is necessary in order to allow section 506(d) to operate is meritless. It improperly differentiates chapter 7 cases by asking whether there are assets, but ignores the fact that this determination of whether or not there is an asset is part of any claims allowance process.

## STANDARD OF APPELLATE REVIEW

In bankruptcy appeals from core proceedings, and in appeals to this Court, conclusions of law are reviewed *de novo* while findings of fact are reviewed for clear error. Fed. R. Bankr. P. 8013 and *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994). This case raises exclusively a question of law.

## ARGUMENT

**I.    The Bankruptcy Court erred in dismissing the Palomars' adversary proceeding based on the lack of subject matter jurisdiction.**

On the most technical of levels the Bankruptcy Court dismissed this adversary complaint for lack of jurisdiction. (Appx. At 26-31.) The Bankruptcy Court held that because the Palomars' underlying Chapter 7

bankruptcy proceeding was closed during the pendency of the adversary proceeding the Bankruptcy Court lost jurisdiction. (Appx. At 29.) The Bankruptcy Court concluded that once the Palomars' bankruptcy case closed, it could only exercise jurisdiction over the adversary proceeding if it found a compelling reason to do so. (Appx. At 29.) The Bankruptcy Court did not find such a reason in this case. (Appx. At 29-31.) The Bankruptcy Court went on to state that even if it were to retain jurisdiction, it would not have granted the Palomars the relief that they sought. (Appx. At 29-31.)

The jurisdiction of bankruptcy courts to hear and decide proceedings is defined in 28 U.S.C. § 1334 and § 157. Section 1334(a) provides that "[e]xcept as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). Section 1334(b) provides: "Notwithstanding any act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising in or related to cases under title 11." 28 U.S.C. § 1334(b). While § 1334 establishes the district court's authority to hear bankruptcy cases, § 157 establishes the same authority for the bankruptcy courts. Section 157(a) provides that "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judge for the district." 28 U.S.C. § 157(a).

According to the Seventh Circuit, a determination of the validity or extent of a lien is a matter that arises in bankruptcy. *In re Repository Technologies, Inc.*, 601 F.3d 710, 719 (7th Cir. 2010). Since it arises in a bankruptcy, it is therefore considered a core proceeding. *Stern v. Marshall*, 131 S.Ct. 2594, 2605 (2011). Since it was a core proceeding, the Bankruptcy Court had jurisdiction to enter a final judgment. *Id.* As the Bankruptcy Court stated, however, the underlying chapter 7 case was closed while the adversary was pending. (Appx. At 29.) The Bankruptcy Court noted that although the Court could have reopened the case had there been a valid reason, the relief being sought was unavailable to the Debtors, so the Court refused to do so. (Appx. At 29-31.)

The Seventh Circuit has held that if a federal court initially has jurisdiction in a matter, it retains jurisdiction even if an intervening event could remove the original basis for the federal jurisdiction. *Chapman v. Currie Motors, Inc.* 65 F.3d. 78, 81 (7th Cir. 1995). Here, since the Bankruptcy Court had valid jurisdiction at the time the adversary was filed, the subsequent closure of the underlying chapter 7 case would not necessarily divest the Bankruptcy Court of its jurisdiction. *See In re Statistical Tabulating Corp. Inc.*, F.3d 1286, 1289 (7th Cir. 1995). The Bankruptcy Court had the discretion to retain jurisdiction over the adversary should it have chosen to do so. *Id.* Furthermore, as the Bankruptcy Court stated, it could have reopened the bankruptcy case to accord relief to the Palomars pursuant

to section 350(b). 11 U.S.C. § 350(b). Had the Court determined that the Palomars were entitled to the relief requested, it could easily have chosen to retain jurisdiction.

For all practical reasons, however, the Bankruptcy Court dismissed the Palomar's adversary complaint because the Bankruptcy Court believed that the desired relief was barred by the Supreme Court's decision in *Dewsnup v. Timm*, 502 U.S. at 410. (Appx. At 29-30.)

## II. The Bankruptcy Court Erred in Ruling a Wholly Unsecured Junior Mortgage Could not be Voided in a Chapter 7.

### A. *Liens and Bankruptcy in Historical Context.*

Prior to the enactment of the Bankruptcy Act in 1898, U.S. bankruptcy laws did not explicitly answer the question of what happens to liens in a bankruptcy proceeding. In the absence of any congressional mandate, judges fashioned their own rules. In 1886, the Supreme Court proclaimed that liens pass through bankruptcy unaffected. *Long v. Bullard*, 117 U.S. 617, 620-21 (1886). This result was more or less codified in Section 67d of the Bankruptcy Act of 1898. *See also City of Richmond v. Bird*, 249 U.S. 174, 177 (1919).

In 1978, Congress overhauled this country's bankruptcy laws by replacing the old Bankruptcy Act with the current Bankruptcy Code. As a part of the 1978 overhaul of the bankruptcy laws, Congress enacted sections

8

506(a) and (d) which together provide the mechanism through which debtors in bankruptcy may value claims and void liens. Section 506(d)(1)[1] as originally enacted was intended to codify the result in *Long v. Bullard*. *Matter of Tarnow*, 749 F. 2d 464, 465 (7th Cir. 1984)(citing H.R. Rep. No. 595, 95th Cong., 2d Sess. 357 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; see also *id.* at 361; S.Rep. No. 989, 95th Cong., 2d Sess. 76 (1978); 3 Collier on Bankruptcy, ¶ 506.07, at p. 506-49).

Given that liens passed through bankruptcy unaffected, the question created by the addition of sections 506(a) and (d) became whether a valid lien exists once a bankruptcy petition is filed, and to what extent. The Supreme Court has opined on this issue three times. First, in *Dewsnup v. Timm*, the Supreme Court held that a debtor in a Chapter 7 bankruptcy could not strip down a primary mortgage lien to the value of the collateral. 502 U.S. at 410. For reasons that will be discussed in further detail below, *Dewsnup*'s interpretation and application of sections 506(a) and (d) proved difficult to interpret and apply. In its next term the Supreme Court was presented with *Nobelman v. American Savings Bank* and had an opportunity to clarify its holding in *Dewsnup*. However, the Supreme Court declined to focus on sections 506(a) and (d) and instead focused on the language of section

---

[1] In 1978, section 506(d)(1) read: to the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless — (1) a party in interest has not requested that the court determine and allow or disallow such claim under section 502.

1322(b)(2) to deny the relief that the petitioner sought. *Nobelman v. American Savings Bank*, 508 U.S. 324 (1993). Finally in *Associates Commercial Corp. v. Rash*, the Supreme Court explored the meaning of "secured claim" under section 506(a) as it applies to personal property. *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997)

Since the *Dewsnup* and *Nobelman* cases were decided, the bankruptcy and appellate courts of this country have routinely allowed debtors in chapters 11, 12 and, 13 (the "reorganization" chapters) to avoid ("strip off") and bifurcate ("strip down") liens. Conversely, the majority of courts have held that a debtor in chapter 7 (the "liquidation" chapter) can neither strip down nor strip off recorded security interests.

The Palomars respectfully submit that those courts who apply the reasoning of *Dewsnup* to bar chapter 7 debtors from stripping off wholly unsecured liens misunderstand and misapply both the plain meaning of section 506(d) and the Supreme Court's holding in *Dewsnup*.

> A-1.    *Dewsnup v. Timm.*

The seminal case of *Dewsnup v. Timm* stands for one very basic proposition: a chapter 7 debtor cannot strip down a consensual lien secured by the debtor's primary residence. 502 U.S. 410 (1992).

On June 1, 1978, Timm loaned $119,000 to Mrs. Dewsnup and her husband[2]. *Dewsnup*, 502 U.S. at 412.  This loan was secured by the

---

[2] Mr. Dewsnup died before the resolution of the case.

Dewsnups' farm. *Id.* In 1979 the Dewsnups defaulted on their loan. *Id.* The Dewsnups filed two petitions for relief under chapter 11 of the Bankruptcy Code. *Id.* at 413. Both petitions were dismissed. *Id.* Finally, the Dewsnups filed for protection under chapter 7 of the Bankruptcy Code. *Id.* By the time that the Dewsnups filed their chapter 7 petition, their farm was worth a mere $39,000. *Id.*

Interestingly, the Dewsnups filed their cases during the short period of time between the enactment of the Bankruptcy Code in 1978 and the addition of chapter 12 as a part of the 1984 amendments. *See, In re Dever*, 164 B.R. 132, 137 (Bankr. C.D. Cal. 1994). It is not disputed that debtors under chapter 12 can strip down an undersecured creditor's lien to the value of the collateral. *Harmon v. US Through Farmers Home Admin.*, 101 F. 3d 574, 577 (8th Cir. 1996).

Because relief under chapter 12 of the Bankruptcy Code was not available to the Dewsnups and because they could not propose a confirmable chapter 11 plan of reorganization, they were forced to proceed under chapter 7 of the Bankruptcy Code. The Dewsnups, relying on what they believed to be the plain and unambiguous language of sections 506(a) and (d), contended that the lien secured by their farm was void to the extent that it exceeded $39,000. *Dewsnup*, 502 U.S. at 414-16. The lien holder contended that the language of sections 506(a) and (d) was not so clear. *Id.* at 416.

In agreeing with Timm, the Supreme Court relied on two general considerations. *Id.* at 416-19. First, the Court was concerned that if a lien could be stripped down, any subsequent increase in the value of the property would benefit the debtor. *Id.*, at 417; *Harmon*, 101 F. 3d at 580. The Court was concerned was that this result was not a part of the bargain entered into between the mortgagor and the mortgagee of real estate. *Dewsnup*, 502 U.S. at 417. Second, the Court did not believe that Congress intended to alter what the Court believed was the longstanding principal that liens pass through bankruptcy unaffected. *Id.* at 418-19; *Harmon*, 101 F. 3d at 580.

The Supreme Court held that the term "allowed secured claim" in section 506(d) is not to be read as an indivisible term defined by reference to section 506(a). *Dewsnup*, 502 U.S. at 416-17. Rather, the Supreme Court held that a court must first determine whether a claim is fully allowed and then determine whether the claim is secured. *Id.* Thus, when there is some value to attach to a claim that has otherwise been fully allowed, a chapter 7 debtor cannot strip down the lien.

As discussed below, this reasoning simply does not apply to bar a chapter 7 debtor from stripping off liens that are wholly unsecured whether or not such claims are fully allowed.

A-2.    *Nobelman v. American Savings Bank.*

The year after the Supreme Court decided *Dewsnup* it was presented with the question of whether a debtor in a chapter 13 proceeding could strip

down a consensual lien secured by the debtor's principal residence. *Nobelman*, 508 U.S. at 325-26. Relying not on the language of sections 506(a) and (d) but rather on the language of section 1322(b)(2), the Supreme Court held that a chapter 13 debtor could not strip down a mortgage secured by the debtor's principal residence. *Id.* at 325-26, 328-32.

The Nobelmans purchased a home in Dallas, Texas in 1984. *Id.* at 326. To finance the purchase of that home, the Nobelmans borrowed $68,250 from American Savings Bank. *Id.* By 1990 the Nobelmans had fallen into default under the terms of the note. *Id.* In an attempt to save their home, the Nobelmans filed for protection under chapter 13 of the Bankruptcy Code. *Id.*

In their chapter 13 plan of reorganization, the Nobelmans proposed to pay American Savings Bank $23,500 as a secured creditor and sought to treat the balance due on the note as a general unsecured debt. *Id.* at 326-27. The Nobelmans argued that the court was required to determine the extent to which American Savings Bank was a secured creditor under section 506(a). *Id.* at 326. To the extent that American Savings Bank was not a secured creditor, the Nobelmans contended, it had no lien and their proposed treatment of the claim of American Savings Bank therefore did not violate the anti-modification clause of section 1322(b)(2). *Id.* at 327-29. In ruling against the Nobelmans, the Supreme Court noted that section 1322(b)(2) did not bar the modification of claims but rather barred the modification of rights

of secured creditors[3]. *Id.* at 328-29. Because stripping down the lien of American Savings Bank would modify the rights of the bank, the Nobelmans could not strip down the lien as a part of their chapter 13 bankruptcy proceeding. *Id.* at 329-30.

Importantly, the Supreme Court noted that the Nobelmans were correct to look to section 506(a) to determine the secured status of the bank's claim. *Id.* at 328. The only reason that the Nobelmans lost their case was because once a consensual lien holder's lien attaches to any value in the debtor's residence, the debtor cannot modify the rights (as opposed to the claim) of that lien holder. *Id.* at 329-31.

### A-3.    *Associates Commercial Corp. v. Rash.*

In 1997 the Supreme Court again had the opportunity to explore the meaning of sections 506(a) and (d). *Rash*, 520 U.S. 953 (1997). Specifically, the question posed to the *Rash* court was: by what method should the court value collateral when a chapter 13 debtor invokes the cram down provision of section 1325(a)(5)(B). *Rash*, 520 U.S. at 955-56.

In holding that the replacement-value standard is the correct valuation standard, the Supreme Court surveyed the meaning of section 506(a). *Id.* at 560-62. Implicit in the Supreme Court's decision is the understanding that once a method of valuation is chosen, section 506(a) provides that a purportedly secured creditor has a secured claim only to the

---

[3] Where such creditor is secured only by an interest in the debtor's primary residence.

extent of the value of the collateral securing the lien and an unsecured claim for the difference. *Id.*

B.    *Sections 506(a) and (d) Permit the Palomars to Strip off First American Bank's Wholly Unsecured Junior Mortgage Lien.*

It is axiomatic that when interpreting a statute the starting point is the language of the statute itself. *Toibb v. Radloff*, 501 U.S. 157, 162 (1991). Where the words and the meaning of a statute are clear, a court will apply the statute in such a way as to give effect to the statute's plain meaning. *In re Frederickson,* 545 F.3d 652, 656 (8th Cir. 2008)(*citing Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004)). The statutory language should be conclusive except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters or lead to absurd results. *Doyle v. Time Warner Cable*, 516 U.S. 1141, 116 S.Ct. 974, 133 L.Ed.2d 894 (1996).

In the case at bar, the language of the relevant statute is clear and the court need look no further. Because the value of the Palomars' house is less than the balance due on their first mortgage, First American Bank holds only an unsecured claim.  11 U.S.C. § 506(a). Because First American Bank holds only an unsecured claim, its lien is void. 11 U.S.C. § 506(d).

To the extent that the Court looks beyond the plain language of sections 506(a) and (d) and for the reasons that follow, this Court should reverse the decision of the Bankruptcy Court and remand this case with instructions to enter judgment for the Palomars.

At issue in the case at bar is the meaning of sections 506(a) and (d) of

the Bankruptcy Code as it applies in a chapter 7 bankruptcy proceeding.

Section 506 states in relevant part:

> (a)(1) An allowed claim of a creditor secured by a
> lien on property in which the estate has an interest,
> or that is subject to setoff under section 553 of this
> title, is a secured claim to the extent of the value of
> such creditor's interest in the estate's interest in
> such property, or to the extent of the amount
> subject to setoff, as the case may be, and is an
> unsecured claim to the extent that the value of
> such creditor's interest or the amount so subject to
> setoff is less than the amount of such allowed
> claim. Such value shall be determined in light of
> the purpose of the valuation and of the proposed
> disposition or use of such property, and in
> conjunction with any hearing on such disposition or
> use or on a plan affecting such creditor's interest.

> (d) To the extent that a lien secures a claim against
> the debtor that is not an allowed secured claim,
> such lien is void, unless--
> (1) such claim was disallowed only under section
> 502(b)(5) or 502(e) of this title; or
> (2) such claim is not an allowed secured claim due
> only to the failure of any entity to file a proof of
> such claim under section 501 of this title

The plain language of section 506(a) says that a creditor has a secured

claim only to the extent of the value of the collateral to which the lien

attaches and has an unsecured claim for the difference. 11 U.S.C. § 506(a).

Despite this clarity, the Supreme Court in *Dewsnup* stated that there was

some ambiguity in the text of the statute. *Dewsnup*, 502 U.S. at 417. If there

is ambiguity in a statute, a court can look to legislative history to resolve the

ambiguity. *E.g., Milner v. Dep't of Navy*, 131 S.Ct. 1259, 1266 (2011). On the other hand, the court will not allow ambiguous language in the legislative history to create a dispute over otherwise clear statutory language. *Id.*

To the extent that this Court finds the language of sections 506(a) and (d) in any way ambiguous, it may look to the legislative history. *Id.* The legislative history behind section 506 states that the intention of the drafters was that a creditor has a secured claim only to the extent of the value of the collateral and an unsecured claim for the balance. H.R. REP 95-595, H.R. Rep. No. 595, 95th Cong., 1ST Sess. 1977, 1978 U.S.C.C.A.N. 5963, 1977 WL 9628. Therefore, if there is no value for a lien to attach to then the lien holder has but an unsecured claim in the bankruptcy. The lien itself is void. 11 U.S.C. § 506(d).

The *Dewsnup* Court held that section 506(d) means that a lien cannot be avoided if a claim is both allowed pursuant to section 502 and secured by any value in collateral. *Dewsnup*, 502 U.S. at 417. Thus, where a claim is either not allowed, or not secured, then it is possible to avoid the lien using section 506(d). The *Dewsnup* decision really only accomplished one thing: it added a limitation to the ability of a chapter 7 debtor to avoid a lien.[4] This

---

[4] However, on the face of the decision the result is to prevent a debtor from making any use of (for example) section 1325(a)(5). This Court should avoid any reading of *Dewsnup* that would make any statute meaningless. As will be discussed below, this is one of the reasons why courts routinely allow debtors to strip liens in chapters 11, 12 and 13 – these courts erroneously refuse to apply *Dewsnup* beyond its facts.

limitation is similar to the limitations found in both Sections 1123(b)(5) and 1322(b)(2) and is not otherwise found in chapter 7.

Based on the limited nature of the *Dewsnup* holding[5], and the plain language and legislative history of section 506(a), the logical conclusion is that if there is no value for a lien to attach to, then the entire claim is unsecured, thus making it possible to avoid the lien pursuant to section 506(d).

This interpretation of sections 506(a) and (d) is supported by the Supreme Court's opinions in *Nobelman* and *Rash*. In *Nobelman*, the Supreme Court stated that section 506(a) was used to separate a partially secured claim into its secured and unsecured portions. *Nobelman*, 508 U.S. at 329. In *Rash*, the Supreme Court acknowledged that a claim can only be secured to the extent of the value of the collateral. *Rash*, 520 U.S. at 960-65. Since both of these decisions came after *Dewsnup*, they can only have clarified the process by which a court should classify claims through the use of section 506(a).

> ### B-1.   *Section 103(a) of the Bankruptcy Code Requires that Sections 506(a) and (d) Apply Equally to Chapters 7, 11, 12 and, 13.*

Section 103(a) provides that "[e]xcept as provided in section 1161 of this title, chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13 of this title." 11 U.S.C. § 103(a). For this reason, sections 506(a) and (d) must mean the same thing in a chapter 7 that they mean in a chapter 11,

12 and, 13. Nothing in section 103(a), however, prevents the various subsections of chapters 11, 12 or 13 from limiting the applicability of sections 506(a) and (d). Thus for example, despite the plain language of sections 506(a) and (d) a debtor in a chapter 11 or a chapter 13 cannot strip down a mortgage secured by the debtor's primary residence. 11 U.S.C. §§ 1123(b)(5), 1322(b)(2).

Sections 506(a) and (d) allow debtors to value claims and void liens. It is undisputed that unless otherwise limited by the various provisions of chapters 11, 12 or 13, a debtor under any of those chapters may void unsecured liens. *E.g., Harmon*, 101 F. 3d at 577; *Dever*, 164 B.R. 132; *Rash*, 520 U.S. 953; *Nobelman*, 508 U.S. 324. Because such practices are permitted in chapters 11, 12 and, 13, section 103(a) mandates that such practice be permitted in a chapter 7.

As will be discussed in further detail below, some courts have held that section 506(d) does not void liens in the "reorganization" chapters of the Bankruptcy Code.[6] These courts believe that liens are avoided solely by the operative provisions of chapters 11, 12 and, 13. These decisions miscomprehend the meaning of the various statutes and the interplay between them. Therefore these courts reach the correct result for the wrong reason.

---

[5] See section *D-1 infra*.
[6] Despite the plain language of the statute.

B-2.    *Other Provisions in the Bankruptcy Code Support the Position that Section 506 (d) is Used to Avoid Liens.*

The Supreme Court has stated that the entire statute can be examined to determine the meaning of a particular portion.

> A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme — because the same terminology is used elsewhere in a context that makes its meaning clear or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 371 (1988).

Several other statutes found in the Bankruptcy Code refer to the lien voiding powers of section 506(d).  Section 522(c)(2)(A)(ii) states that exempt property is protected other than debts secured by a lien "not void under section 506(d) of this title". 11 U.S.C. § 522(c)(2)(A)(ii).  Section 551 states "any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to property of the estate." 11 U.S.C. § 551. Finally, section 349(b)(1)(C) states that upon dismissal of a case, any liens voided under section 506(d) are to be reinstated. 11 U.S.C. § 349(b)(1)(C). If liens cannot be avoided through the use of 506(d), then *all* of these statutes are simply surplusage, which stands in contradiction to the axiom that courts must give meaning to all words in a statute. *Negonsott v. Samuel*, 507 U.S. 99, 106 (1993).

20

### B-3. The Public Policy Embedded in the Bankruptcy Code of Giving Debtors a Fresh Start Requires that this Court Grant the Palomars Relief.

Interpreting sections 506(a) and (d) to afford the Palomars their requested relief is consistent with the primary purpose of the bankruptcy code: to give the honest, but unfortunate debtor a fresh start. *See, Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). The central functional purpose of sections 506(a) and (d) is to make sure that similarly situated creditors receive similar treatment. *Cf., In re Franklin*, 126 B.R. 702, 704 (Bankr. N.D. Miss. 1991)(stating that an unsecured deficiency on a claim bifurcated under section 506(d) "could be modified and treated in a similar manner as other unsecured claims"). Thus, for example, all general unsecured creditors receive their pro-rata share of the proceeds of the bankruptcy estate. Similarly, under the operation of 506(a) a wholly unsecured mortgage should be treated the same as any other general unsecured claim.

The Bankruptcy Code no longer distinguishes between secured and unsecured creditors but rather distinguishes between secured and unsecured claims. H.R. REP. 95-595, H.R. Rep. No. 595, 95TH Cong., 1ST Sess. 1977, 1978 U.S.C.C.A.N. 5963, 1977 WL 9628. To read sections 506(a) and (d) to bar the relief requested is to refuse to recognize this difference, codified in 1978. To read sections 506(a) and (d) to bar the relief requested is directly at odds with the policy of providing the Palomars a fresh start.

An interpretation of sections 506(a) and (d) that bars the relief requested would leave this second mortgage hanging as an anchor tethered to nothingness. The Palomars will be unable to pay for their residence, will lose it to foreclosure and the junior mortgage will receive no proceeds from the sale and will not have recourse against the Palomars personally. Given the overarching policy of the bankruptcy code, this Court should choose to allow the Palomars to strip off their wholly unsecured mortgage and keep their house.

C.    *Lien Stripping in the Reorganization Chapters of the Bankruptcy Code.*

Nearly every appellate court of which the Palomars are aware that has ruled on the question of whether a debtor in a "reorganization" chapter of the Bankruptcy Code can avoid a wholly unsecured junior mortgage has correctly held that such relief is available.[7] *E.g., Holloway v. United States*, 2001 WL 1249053 (N.D.Ill. Oct.16, 2001); *In re Waters*, 276 B.R. 879 (N.D. Il 2002) *In re Pond*, 252 F.3d 122 (2nd Cir. 2001); *In re McDonald*, 205 F.3d 606 (3rd Cir. 2000); *In re Bartee*, 212 F.3d 277 (5th Cir. 2000); *In re Lane*, 280 F.3d 663 (6th Cir. 2002); *In re Zimmer*, 313 F.3d 1220 (9th Cir. 2002); *In re Tanner*,

---

[7] The one exception was a recent opinion by the 10th Circuit, which incorrectly held that *Dewsnup* bars a chapter 13 debtor from using 506 to strip a lien. however, though not confronted with the question as to whether or not a debtor could use section 1322 to strip a lien, the opinion indicated that the court would have looked favorably upon such an argument. *In re Woolsey*, 696 F.3d 1266, 1275-79 (10th Cir. 2012).

217 F.3d 1357 (11th Cir. 2000). *In re Griffey*, 335 B.R. 166 (B.A.P. 10th Cir. 2005); *In re Mann*, 249 B.R. 831 (B.A.P. 1st Cir. 2000).

Indeed, the Supreme Court's decision in *Nobelman* implicitly recognized that this was true. *See Nobelman*, 508 U.S. 324. These courts uniformly recognize that if there is no value to support the lien, the creditor cannot be the holder of a secured claim in a bankruptcy proceeding. Of course, once that determination is made under section 506(a), then section 506(d) operates to void the lien. In making this determination, these courts take no heed of any of the concerns expressed by the *Dewsnup* Court.

As explained below, the various subsections of the functional chapters of the Bankruptcy Code can limit the applicability of sections 506(a) and (d). That is exactly what sections 1322(b)(2) and 1325(a)(5)(B) do. When dealing with a chapter 13 debtor who is trying to strip off or strip down a lien, the court will first look to section 506(a) and will value the claim. Once that is done, the court will look to section 506(d) and will bifurcate the claim into secured and unsecured components. Finally, the court will look to any limitations to the debtor's ability to void the lien securing the collateral. If no limitation is to be found then the lien is void to the extent that it is unsecured. 11 U.S.C. § 506(d). If such a limitation is found then the debtor must comply with that limitation.[8]

---

[8] See for example section 1325(a)(5)(B)(ii) requiring the debtor to pay the full value of the allowed secured claim.

Section 506(d) applies to junior mortgages. As Justice Stevens noted in his concurrence in *Nobelman*, Congress sought to safeguard the free flow of capital in the residential lending market by giving favorable treatment to primary mortgage holders. *Nobelman*, 508 U.S. at 332 (Stevens, J., Concurring). Hence, the petitioner in *Nobelman* could not modify the rights of his primary mortgage lender. However, a second mortgage is rarely used to purchase a property. *McDonald*, 205 F.3d at 613; *Zimmer*, 313 F.3d at 1227. Thus concerns over the free flow of purchase money capital simply do not apply with any vigor to a junior mortgage. The holder of a second mortgage should be treated like other general creditor. *McDonald*, 205 F.3d at 610.  For that reason, a wholly unsecured second mortgage should be subject to the same rules as any secured claimant. *Id.* If that claim lacks value, it should be treated as unsecured. *Id.*

For the above reasons, courts uniformly allow chapter 13 debtors to strip off wholly unsecured junior mortgages. Nothing about this reasoning in any way indicates that it does not apply with equal force in a chapter 7.

D.    *Lien Stripping in Chapter 7 Proceedings.*

The Supreme Court's decision in *Dewsnup* has not deterred chapter 7 debtors from attempting to avoid liens in various situations. The recent downturn in the real estate market has lead to an increase in the number of chapter 7 debtors attempting to strip off wholly unsecured junior mortgages. *E.g., Pomilio v. MERS et al.*, 425 B.R. 11 (E.D.N.Y. 2010); *In re Caliguri*, 431

24

B.R. 324 (Bankr. E.D.N.Y. 2010); *Hares v. Sage Financial*, 431 B.R. 796 (Bankr. S.D. Oh. 2010). The majority of courts incorrectly hold that the Supreme Court's holding in *Dewsnup* bars a chapter 7 debtor from stripping off a wholly unsecured lien. *E.g., In re Immel*, 436 B.R. 538, 541-545 (Bankr. N.D. Ill. 2010). For the reasons that follow, this Court should join the minority of courts and hold that *Dewsnup* is not an obstacle to a chapter 7 debtor stripping off a wholly unsecured junior mortgage.

> D-1.    *Dewsnup Does Not Bar the Relief that the Palomars Seek.*

The question presented in *Dewsnup* was whether a chapter 7 debtor may strip down a creditor's consensual lien on real property to the value of the collateral. 502 U.S. 410, 411-12. The *Dewsnup* court was very careful to limit the extent of its holding to the facts then presented: "hypothetical applications that come to mind and those advanced at oral argument illustrate the difficulty of interpreting the statute [11 U.S.C. §§ 506(a), (d)] in a single opinion that would apply to all possible fact situations. We therefore focus upon the case before us and allow other facts to await their legal resolution on another day." 502 U.S. at 416-17. Since the holding of *Dewsnup* was limited specifically to its facts, it must be limited to those cases in which a mortgage has a partially secured claim.[9]  The mortgage held by First

---

[9] This is not the only time in which the Supreme Court has issued a decision in a bankruptcy matter which it specifically limited the decision to the particular facts before it. As one bankruptcy court recently stated, "the Supreme Court made clear in *Stern* that its holding was to be limited to the facts before it. *Stern v. Marshall*, 131 S.Ct. 2620 (stating that its holding is "narrow" and limited to the "one isolated respect" of counterclaims based on state

American Bank in this case is not partially secured, it is wholly unsecured.

"Although *Dewsnup* is the Supreme Court decision most analogous to this

appeal, it is not dispositive; the facts of *Dewsnup* are significantly

distinguishable from the facts of the case at bar such that the bankruptcy

court's reliance on *Dewsnup* is ultimately misplaced." *In re Yi*, 219 B.R. 394,

397 (E.D. Va. 1998). Although the *Nobelman* Court used the phrase "claim . .

. secured by a lien" to encompass both the secured and the unsecured portions

of an under secured claim, that phrase cannot logically include a lien that has

no secured portion. *Yi*, 219 B.R. at 399 (citing *Nobelman*, 508 U.S. at 329-31).

> As the *Yi* Court stated:

> "Where there is no value underlying the claim, there is not a
> secured claim, despite the existence of a document to the
> contrary." In other words, "[t]he code does not generally classify
> creditors based on the existence of a piece of paper purporting to
> give a creditor rights in specified collateral, but rather on
> whether a creditor actually holds a claim supported by valuable
> estate property."

*Yi,* 219 B.R. at 398. (internal citations omitted).

Recently, the Eleventh Circuit Court of Appeals agreed. The Court

held that *Dewsnup* did not expressly overrule a prior decision of the Court in

which a wholly unsecured junior mortgage was voidable through the use of

section 506(d). *In re McNeal,* 477 Fed. Appx. 562, 564 (11th Cir. 2012). As the

Court stated:

> Because *Dewsnup* disallowed only a " strip down" of a
> partially secured mortgage lien and did not address a " strip

---

law that are not resolved in the process of ruling on the creditor's claim). *In re Kimball Hill,
Inc.*, 480 B.R. 894, 899 (Bankr. N.D. Ill. 2012).

off" of a wholly unsecured lien, it is not "clearly on point" with the facts in *Folendore* or with the facts at issue in this appeal.

*Id.*

Congress has twice partially abrogated the holding of *Dewsnup* with the addition of new statutes. First, in 1994, Congress added section 522(f)(2)(A). 11 U.S.C. § 522(f)(2)(A). Courts interpreting section 522(f)(2)(A) recognize that this statute preserves for debtors any increase in the value of their property. *E.g., In re Pepper*, 210 B.R. 480, 484-85 (Bankr. D. Colo. 1997). Thus, to the extent that the *Dewsnup* Court believed that a creditor was entitled to any increase in the value of collateral so as to prevent a windfall for the debtor, its reasoning has been overruled.

Second, in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Amendments (BAPCPA), Congress added section 506(a)(2) to the then existing section 506(a). Section 506(a)(2) fixes the value of a bankrupt debtor's personal property as of the date of the filing of the petition. Section 506(a)(2) preserves for the debtor any increase in the value of his possessions. Thus, to the extent that the *Dewsnup* Court believed that a creditor was entitled to any increase in the value of collateral, its reasoning has been overruled.

In this case, the Palomars' residence is worth $165,000. The principal balance on the first mortgage is $242,894.83. Like *Dewsnup*, since the balance on the mortgage is greater than the value of the property, the first

mortgage has a partially secured claim. In this case, unlike *Dewsnup*, there is a junior mortgage. Since the claim of the first mortgage exceeds the value of the underlying property, there is no value for the junior mortgage's claim to attach to. The junior mortgage is wholly unsecured. 11 U.S.C. § 506(a). Like the plaintiffs in *Yi*, the Palomars should be freed of their wholly unsecured junior mortgage.

> D-2.   *Courts that Extend the Holding of Dewsnup to Disallow Chapter 7 Debtors from Stripping Off Wholly Unsecured Liens Misread and Misapply the Holding of Dewsnup.*

The rationale put forth by the majority of courts extending the holding of *Dewsnup* beyond its facial limitation to that specific fact pattern to encompass wholly unsecured mortgages is fatally flawed. Courts that extend the *Dewsnup*[10] holding to wholly unsecured claims have all relied on one or more equally unsound premises: First, that there is no substantive distinction between a "strip off" and a "strip down" in a chapter 7; second, that *Nobelman,* neither contradicted nor modified *Dewsnup*; finally, that stripping off a lien using sections 506(a) and (d) in chapter 7 is impermissible because section 506 provides no independent power for a debtor to avoid a lien. *In re McNeal* 2010 WL 1753376 (Bank. N.D. Ga. 2010) at *2-3. *rev'd*, 477 Fed. Appx. 562 (11th Cir. 2012).

---

[10] The majority of courts, including three circuit courts, to rule on this issue have extended the holding of *Dewsnup* to wholly unsecured claims. *E.g., In re Talbert*, 344 F.3d 555 (6th Cir. 2003); *In re Ryan*, 253 F.3d 778 (4th Cir. 2001); *In re Laskin*, 222 B.R. 872, (9th Cir. B.A.P. 1998).

First, the proposition that there is no substantive difference between a "strip down" and a "strip off" ignores the plain language of both the statute and the Supreme Court's decisions in *Nobelman* and *Rash*. *Nobelman* and *Rash* stated that the determination of a claim's secured status is made through section 506(a). *Nobelman*, 508 U.S. at 328-29; *Rash*, 520 U.S. at 960-65. In a "strip down" case, there is value for a claim to attach to and therefore there is a (partially) secured claim. *Dewsnup*, 502 U.S. 410; *Nobelman*, 508 U.S. 324. Conversely, in a "strip off" case, where there is absolutely no value for a claim to attach to, section 506(a) tells us that there is no secured claim and therefore section 506(d) voids the lien.

Courts finding that there is no difference between a strip off and a strip down fail to recognize that an unsecured creditors' rights are always modified, regardless of the chapter the debtor chooses, and fail to recognize that there is no basis for a creditor who holds an unsecured claim to believe the claim cannot be modified simply because the creditor has a piece of paper purporting to give it a lien on something that does not exist: value. *In re Geyer*, 203 B.R. 726, 729-30 (Bankr. S.D. Cal. 1996). Creditors are classified by the Bankruptcy Code based on whether their claim is supported by any value, not based on whether they have something that gives them rights in certain collateral. *Id.*

Second, while it is true that *Nobelman* did not discuss section 506(d) itself, *Nobelman*, and later *Rash*, did clarify the use of section 506(a) in

making the determination of whether a claim is secured or unsecured. Both *Nobelman* and *Rash* found that a claim can only be secured to the extent of the value of the collateral. *Nobelman*, 508 U.S. at 328-29; *Rash*, 520 U.S. at 960-65. In this case, where there is no value for the claim to attach to, the claim must be considered an unsecured claim. The reasoning of *Dewsnup* applies only to secured claims, not to unsecured claims.

Finally, the argument that a debtor cannot use sections 506(a) and (d) to avoid a lien because section 506 does not provide the debtor with the power to avoid a lien is both circular and misguided. Other than section 522(f)(1), which applies only to judicial liens,[11] the *only* statute in the Bankruptcy Code that operates to allow a debtor the exclusive right to avoid a lien is section 506(d) used in conjunction with section 506(a).[12]

Section 506(d) is self operating once collateral is valued under section 506(a). Pursuant to section 103(a), sections 506(a) and (d) apply equally to chapters 7, 11, 12 and, 13 except as expressly limited by the various

---

[11] Section 522(f)(1) reads: (1) Notwithstanding any waiver of exemptions but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is--
(A) a judicial lien, other than a judicial lien that secures a debt of a kind that is specified in section 523(a)(5); or
(B) a nonpossessory, nonpurchase-money security interest in any--
(i) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;
(ii) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or
(iii) professionally prescribed health aids for the debtor or a dependent of the debtor.

subsections in chapters 7, 11, 12 and, 13. 11 U.S.C. § 103(a). By way of example, chapter 13 has two limitations on the power of a debtor to use sections 506(a) and (d) to strip a lien. First, a chapter 13 debtor cannot use sections 506(a) and (d) to strip down a lien when that lien attaches *only* to the debtor's primary residence.  11 U.S.C. § 1322(b)(2). Second, a chapter 13 debtor who has bifurcated a lien under section 506(a) must pay the lien holder in full for its allowed secured claim. 11 U.S.C. § 1325(a)(5)(B)(ii). There are no similar limiting provisions found anywhere in chapter 7 of the Bankruptcy Code[13].

The Fourth Circuit, Sixth Circuit and, Bankruptcy Appellate Panel for the Ninth Circuit have incorrectly extended *Dewsnup* to bar a chapter 7 debtor from stripping off a wholly unsecured mortgage. *Ryan*, 253 F. 3d at 782; *Talbert*, 344 F. 3d at 562; *Laskin*, 316 F. 2d at 876. These courts all relied on the faulty premise that section 506 was intended to facilitate valuation and disposition of property in chapters 11, 12 and, 13. *Laskin,* 222 B.R at 876 (citing *Oregon v. Lange*, 120 B.R. 132, 135 (B.A.P. 9th Cir. 1990)).

That argument completely ignores one of the basic tenets of statutory construction: when statutory text is plain and unambiguous, the courts must enforce the plain language of the statute. *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, (2004). In this case, section 103(a) requires that chapters 1, 3, and 5

---

[12] Debtor notes that sections 544, 545, 547 and 548 bestow upon the debtor the contingent right to avoid certain types of liens.  Said rights are contingent among other things, on the Trustee not using his powers to avoid those liens..

equally to chapter 7, 11, 12 and 13. If the function of section 506(a) were limited to facilitating distribution in chapters 11, 12 and, 13 then section 506(a) would have no purpose in chapter 7 and section 103(a) would be nonsensical.

Other courts extend *Dewsnup* to a wholly unsecured mortgage in a chapter 7 because they believe that it is, for example, section 1322(b)(2) and not section 506 which voids liens. *In re Hill*, 440 B.R. 176, 180-81 (Bankr. S.D. Cal. 2010). In addition to modifying claims, section 1322(b)(2) is a limitation to determine whether or not a lien qualified to be avoided through the use of sections 506(a) and (d). Courts that believe that liens are avoided solely through the operation of section 1322(b)(2) rather than in conjunction with sections 506(a) and (d) should take note that the end result of this position is that section 506(d) is never used to avoid a lien, which would make the entire section of the statute superfluous. Such a reading runs afoul of well establish precedent requiring a court to interpret a statute in such a way as to give meaning to all of its terms. *Negonsott,* 507 U.S. at 106.

Taking section 103(a) at its plain meaning, it would be impossible for section 506 to apply only to the reorganization chapters of the code. Since meaning must be given to every word in a statute, everything in chapter 5 of the Code applies to chapter 7 cases, as well as chapter 11, 12 and, 13 cases. *Negonsott*, 507 U.S. at 106. "Indeed, if sections 506(a) and (d) were intended

---

[13] Although the Court's holding in *Dewsnup* now operates as a limitation on chapter 7 cases.

only for the organizational chapters of the Bankruptcy Code, then Congress could have simply limited the language in sections 506(a) and (d) to exclude chapter 7." *In re Smoot*, 2011 WL 5240365 at *5 (Bankr. E.D.N.Y. 2011) *rev'd*, 478 B.R. 555 (E.D. N.Y. 2012).

Further evidence of Congress' desire to have section 506 apply to chapter 7 can be found in section 722, which allows chapter 7 debtors to redeem personal property "by paying the holder of such lien the amount of the allowed secured claim." 11 U.S.C. § 722. Since section 506(a)(2) is dispositive for determining the value of personal property, the term "allowed secured claim" in section 722 must refer to the term as defined in section 506(a). Clearly then, "it is inaccurate to say that § 506 was only intended to facilitate valuation in the reorganization chapters. Not only is there no statutory support for that claim, there is actual practice to the contrary." Michael Myers, *Dewsnup Strikes Again: Lien-Stripping of Junior Mortgages in Chapter 7 and Chapter 13,* 53 Ariz. L. Rev. 1333, 1357 (2011). Clearly, the courts that have chosen to extend the holding of *Dewsnup* did so although it was not warranted. As the Eleventh Circuit stated, "[o]bedience to a Supreme Court decision is one thing, extrapolating from its implications a holding on an issue that was not before that Court…is another thing." *McNeal*, 477 Fed.Appx. at 564. (internal citations omitted).

D-3.   *Courts that Limit Dewsnup to its Facts and Allow*
*Chapter 7 Debtors to Strip Off Wholly Unsecured*
*Mortgages Correctly Read both Dewsnup and Sections*
*506(a) and (d).*

While still a distinct minority of courts, those courts allowing a chapter
7 debtor to strip off a wholly unsecured junior mortgage correctly recognize
that *Dewsnup* was limited to its facts and correctly read the plain language of
sections 506(a) and (d).

First, these courts correctly recognize that there is no difference
between stripping off a wholly unsecured lien in a chapter 13 and in a
chapter 7. *Smoot*, 2011 WL 5240365 at *5(citing *Lavelle* 2009 WL 4043089*6
(stating "[t]he plain meaning is applied to Chapter 13 Section 1322(b)(2)
analysis where the lien is wholly unsecured, and there is no logical reason to
read the text [of Section 506(a)] differently when applied to chapter 7 wholly
unsecured liens."))

Second, these courts correctly recognize that a chapter 7 debtor will
not necessarily realize a windfall if he is allowed to strip off a wholly
unsecured lien. *Lavelle* 2009 WL 4043089*6.

> "Arguments that debtors will benefit from possible windfalls, are not
> persuasive.  Markets are uncertain, and it is not certain such a
> scenario will ever occur.  Secondly, the creditors' right to foreclose will
> not result in any present monetary gain for the creditor since there is
> no value in the property for them.  Bankruptcy is not intended to
> benefit either the creditor in securing a potential increase in property
> value, or the debtor.  However, where the future is unknown,
> bankruptcy principles of giving the debtor a fresh start should apply.
> While these issues of debtors' and creditors' rights are the subject of
> long standing philosophical debate, in light of the unambiguous, clear
> language of § 506(a) and (d), § 506(d) requires this Court to void the

lien as a matter of law regardless of any possible further potential debtor benefits."

*Lavelle* 2009 WL 4043089 at *6.

Courts finding that allowing a chapter 7 debtor to strip off a mortgage would result in a windfall to the debtor all rely on the same faulty premise: that because under the pre-Code law liens on real property passed through bankruptcy unaffected removing them could result in a windfall to the debtor. In a chapter 13 case, the debtor actually realizes a larger windfall than would a chapter 7 debtor. *Smoot*, 2011 WL 5240365 at *5. During a chapter 13 case, the debtor continues to make payments towards his primary mortgage such that, by the time his case closes, he actually has more equity than he would have had if he had stripped the lien in a chapter 7. In addition, a chapter 13 debtor is not required to pay anything to unsecured creditors. So, it is possible for a debtor to file a chapter 13 proceeding, pay back his secured debt (such as arrearages on a primary mortgage and cars), pay 0%[14] to unsecured claims and strip off his second mortgage.  It simply does not make sense to say that this is permissible in a chapter 13 but not in a chapter 7.

---

[14] See sections 1322 and 1325 setting forth the requirements for confirmation of a Chapter 13 plan.  There is no requirement that a debtor repay any given percentage or amount to general unsecured creditors.  In theory, a debtor could propose a confirmable plan that does not pay anything at all to general unsecured creditors. In fact, the proper utilization of section 1322(a)(4) requires that general unsecured creditors receive a 0% dividend.

Third, courts that allow chapter 7 debtors to strip off wholly unsecured junior mortgages implicitly, if not explicitly, recognize that the *Dewsnup* Court's concern over not altering the result that the mortgagor and mortgagee of real estate bargained for simply does not apply to a wholly unsecured second mortgage. *Smoot*, 2011 WL 5240365 at *6. Given that wholly unsecured subordinate mortgage liens are treated like any other unsecured claims in a chapter 13, there is no reason why they should be given special protection in the context of a chapter 7. *Smoot*, 2011 WL 5240365 at *6.

>    E.    The Bankruptcy Court's Decision Below was Erroneous for Two Additional Reasons.

The Bankruptcy Court's decision improperly expanded the holding of *Dewsnup*, by distinguishing between "asset" and "no asset" chapter 7 cases and relying on the claims allowance process of section 502(a). None of the reasons cited by the Bankruptcy Court for denying the Palomars the requested relief are meritorious. This case should be remanded with instructions to enter judgment in favor of the Palomars.

>    E-1.    The Bankruptcy Court Drew an Impermissible Distinction Between Asset and no-Asset Chapter 7 Cases.

The Bankruptcy Court dismissed the Palomars' complaint in part because there is no claims allowance process in a "no-asset" chapter 7. (R. at 58-59.) The Bankruptcy Court erroneously relied on its decision in *In re Immel* for the proposition that a claims allowance process is a necessary

36

condition to strip off a lien. *Immel*, 436 B.R. at543 (citing *In re Laskin*, 222 B.R. 872, 876 (9th Cir. B.A.P. 1998)). (R. at 58-59.)  However, a claims allowance is only a sufficient condition to lien stripping, not a necessary one. Therefore, this reasoning lacks merit.

The Bankruptcy Court implied that a debtor could avoid a wholly unsecured junior mortgage lien in a chapter 7 case if that chapter 7 case were an "asset case." This would have the effect of punishing those who are too poor or too unlucky to have anything for a chapter 7 trustee to liquidate while rewarding those who have even minimal assets available for distribution.[15] It also has the effect of encouraging debtors to "create" an asset - for example by converting an exempt IRA into a non-exempt savings account just for the purpose of avoiding filing a chapter 13 case (or perhaps because they cannot afford a chapter 13 repayment).

Furthermore, "the determination of whether a lien or interest against property is unsecured and thus disallowed as a secured claim is made independently of whether there are any assets available for distribution to general unsecured creditors. There is no separate provision in the Bankruptcy Code for determining whether a lien or interest is secured for a

---

[15] It can also reward and punish debtors based on the Interim Trustee to which their case happens to be assigned.  For example, some Interim Trustees never seek turnover of tax refunds whereas other Interim Trustees seek turnover of even the smallest tax refund.  In the former case there would not be any assets available for distribution and the Bankruptcy Court would not allow the debtors to strip off their wholly unsecured junior mortgage whereas in the latter case the Bankruptcy Court has indicated that in a case with assets to be administered, it would allow that relief.

no asset chapter 7 case as opposed to one with assets for distribution." *Smoot*, 2011 WL 5240365 at *4, The Bankruptcy Court improperly invented such a distinction to justify its decision to extend *Dewsnup*.

### E-2.   The Claims Allowance Process is not a Necessary Condition to Avoiding a Lien using Section 506(d).

The Bankruptcy Court erred when it held that the claims allowance process is a necessary prerequisite to stripping off a wholly unsecured lien. section 502(a) of the Bankruptcy code provides that "[a] claim or interest . . . is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). The notion that there is no claims allowance process simply because there are no claims filed is flawed.  There is a claims allowance process in every case filed; however, in no asset chapter 7 bankruptcies the Court does not need to be involved.

Although 11 U.S.C. § 502 governs the allowance of claims, there is no indication of where the "process" begins, or what it entails.  The process of claims allowance should begin with the determination of whether or not there are claims to be filed.  That is done by the chapter 7 Trustee assigned to the case pursuant to the Bankruptcy Code. 11 U.S.C. § 704(a).  The trustee is required to make a determination as to whether there are assets that can be administered for the benefit of the bankruptcy estate.  In the majority of chapter 7 cases, the Trustee makes a determination that there are no assets to be administered, and therefore, there is no reason for claims to be filed.

However, simply because claims are not filed, there was still a determination made whether or not claims should be filed, and therefore, there is a claims allowance process.

Regardless of whether there are assets available for distribution in a chapter 7 case, where a debtor, a "party in interest", commences an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(2) to "determine the validity, priority, or extent of a lien or other interest in property" there is a formal objection to such creditor's lien or interest in property. There need not be a filed proof of claim in order to determine whether the claim or interest against the Debtor's property should be allowed or removed. *Warthen v. Smith*, 247 B.R. 191, 196-97 (W.D. Va. 2000).

Even in an "asset case" it would be improper for a debtor to request this kind of relief via an objection to a claim. Fed. R. Bankr. P. 3007(b). An objection to a claim filed under section 502(a) is improper to the extent that such objection seeks relief of a kind specified in Federal Rule of Bankruptcy Procedure 7001. The determination of the nature and extent of a lien must be sought in an adversary proceeding. Fed. R. Bankr. P. 7001(2). Thus, the Bankruptcy Court committed a reversible error when it held that the claims allowance process was a necessary prerequisite to avoiding a wholly unsecured lien.

Furthermore, as a practical matter, secured creditors *never* receive a distribution in a chapter 7, whether an asset case or not.  The Seventh

Circuit itself has held that a secured creditor is not required to file a claim in an asset chapter 7. *Tarnow*, 749 F.2d at 469.

Thus, if the claims allowance process were a necessary condition to avoiding a lien after *Dewsnup*, no debtor in any chapter 7 would ever be able to avoid a lien under section 506(d). This would render meaningless the provisions of section 103(a) requiring that section 506(d) apply equally to chapters 7, 11, 12 and, 13. Such a reading of *Dewsnup* and of the Bankruptcy Code would be contrary to the mandate that a court give meaning to every word in a statute. *Negonsott*, 507 U.S. at 106.

If a secured creditor will never receive a distribution in a chapter 7, and if said creditor is not even required to file a claim, then it would not matter if there is a claims allowance process or not. At least one bankruptcy court has found that the claims allowance process is completely meaningless in *any* chapter 7 case. *In re Talbert*, 268 B.R. 811, 815 (Bankr. W.D.Mich. 2001) *aff'd*, 344 F.3d 555 (6th Cir. 2003). The Palomars agree that the claims allowance process has nothing to do with lien avoidance.

## CONCLUSION

It is irrefutable that *Dewsnup* is the law of the land.  However, it is also irrefutable that *Dewsnup* expressly limited its holding to the specific facts before it at that time.  Subsequent decisions by the Supreme Court and statutory interpretation of the Bankruptcy Code clearly indicate that the courts  that extend the holding in *Dewsnup* to include wholly unsecured

junior mortgages, are doing so incorrectly. In order to properly reconcile the

Bankruptcy Code with the law, this Court must permit avoidance of wholly

unsecured mortgages in a chapter 7.

WHEREFORE, the Plaintiff-Appellants respectfully request that this

Court enter an order remanding this proceeding to the Bankruptcy Court

with instructions to enter judgment in favor of the Plaintiff-Appellants.


Respectfully Submitted:
Alejandro Palomar and Rafaela Palomar
Plaintiff-Appellants


By:    */s/ Nathan E. Curtis*
Nathan E. Curtis
Jonathan D. Parker
Peter Francis Geraci

Dated: December 10, 2012

Attorneys for Plaintiff-Appellants
Geraci Law L.L.C.
55 E. Monroe St., Suite 3400
Chicago, IL 60603
Phone: 312-499-6201
Fax: 877-247-1960

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 10,712 words excluding the parts of this brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 12-point Century.

/s/ Nathan E. Curtis
By: Nathan E. Curtis
Attorney for Plaintiff-Appellants
Alejandro and Rafaela Palomar

Geraci Law L.L.C.
55 E. Monroe Street, Suite 3400
Chicago, IL 60603
(312) 499-6201

## CERTIFICATE OF SERVICE

I, Nathan E. Curtis, an attorney, certify that I served true and accurate copies of the Brief of Plaintiff-Appellants Alejandro and Rafaela Palomar, along with a digital version of the same, to the following persons on or before 5:00 p.m., the 10th day of December, 2012, by depositing the same in the U.S. Mail with first-class postage prepaid at the mailbox or mail-chute at 55 E. Monroe, Chicago, IL, 60603.

Attorney for the Defendant-Appellee
Sean Rahilly
Associate General Counsel
First American Bank
1650 Louis Ave
Elk Grove Village, IL 60007

Plaintiff-Appellants
Alejandro and Rafaela Palomar
1937 S. Clinton Ave.
Berwyn, IL 60402

/s/ Nathan E. Curtis
By: Nathan E. Curtis
Attorney for Plaintiff-Appellants
Alejandro and Rafaela Palomar

Geraci Law L.L.C.
55 E. Monroe Street, Suite 3400
Chicago, IL 60603
(312) 499-6201

## CERTIFICATE OF COMPLIANCE WITH RULE 30(d)

I, Nathan E. Curtis, an attorney, swear and affirm that all the materials required by Circuit Rule 30(a) and (b) have been included in this appendix.


/s/ Nathan E. Curtis
By: Nathan E. Curtis
Attorney for Plaintiff-Appellants
Alejandro and Rafaela Palomar


Geraci Law L.L.C.
55 E. Monroe Street, Suite 3400
Chicago, IL 60603
(312) 499-6201

# APPENDIX TABLE OF CONTENTS

Complaint to Determine Nature and Extent of First
American Bank's Lien and to Avoid the Junior Lien
Of First American Bank ……………………………………………………..Appx. 1

Order Denying Plaintiffs' Motion for Default and
Default Judgment and Dismissing Adversary
Proceeding …………………………………………………………..…….Appx. 26

Order Affirming Bankruptcy Court's Judgment ..………………………Appx. 32

Memorandum Opinion and Order ………………………………………Appx. 33

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 11-30585 |
| | ) | |
| Alejandro Palomar and | ) | Hon. Susan Pierson Sonderby |
| Rafaela Palomar | ) | |
| Debtors, | ) | Chapter 7 |
| | ) | |

_____ ) _____

| | | |
|---|---|---|
| | ) | |
| | ) | |
| Alejandro Palomar and | ) | Adv No. |
| Rafaela Palomar | ) | |
| Plaintiffs | ) | Hon. Susan Pierson Sonderby |
| | ) | |
| v. | ) | |
| | ) | |
| First American Bank | ) | |
| | ) | |
| Defendant | ) | |

### COMPLAINT TO DETERMINE NATURE AND EXTENT OF FIRST AMERICAN BANK'S LIEN AND TO AVOID THE JUNIOR LIEN OF FIRST AMERICAN BANK

NOW COME the Plaintiffs, Alejandro Palomar and Rafaela Palomar by and through Jonathan D. Parker and Nathan E. Curtis, one of their attorneys at Geraci Law L.L.C. and hereby respectfully submit their Adversary Complaint to Determine the Nature and Extent of First American Bank's Lien and to Avoid the Junior Lien of First American Bank and in support thereof state as follows:

### Preliminary Statement

1.      This is an action to determine that the junior mortgage lien of First American Bank is a wholly unsecured debt and therefore not allowed as a secured claim. Claims that are not allowed as secured claims are void.  11 U.S.C. §§ 502, 506(a), (d).

### Jurisdiction and Venue

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a), (b).

3.     This is a core proceeding under 28 U.S.C. §§ 157(a), (b)(2)(A), (B), (I), (K).

4.     Venue is proper in the Northern District of Illinois, Eastern Division pursuant to 28 U.S.C. §§ 1391(b), 1409.  The Plaintiffs are residents of and reside in Cook County, Illinois.

5.     This matter has been referred to this Court via Internal Operating Procedure 15(a) of the District Court for the Northern District of Illinois.

### Parties

6.     Upon information and belief, First American Bank has its principal place of business in Elk Grove Village, Illinois.

7.     The Plaintiffs are individuals residing at 1937 S. Clinton Avenue, Berwyn, Illinois 60402.

8.     The Plaintiffs are the debtors in the underlying Chapter 7 bankruptcy case currently pending in this Court.

9.     The Defendant is a mortgage lender.

### Factual Allegations

10.    The Plaintiffs own their residence located at 1937 S. Clinton Avenue, Berwyn, IL 60402.  This property is worth $165,000.  (Ex. A.)  This property has an index number of 16-19-321-014-0000.

11.    This residence is subject to two mortgage liens.  The first mortgage lien is held by LBPS.  This mortgage has an outstanding principal balance of $242,894.83.  (Ex. B.).  This mortgage was executed on January 10, 2005 and recorded with the Cook County Recorder of Deeds on January, 2005 as document number 0502002229.

12.     The second mortgage lien is held by First American Bank.  While the Plaintiffs do not know the outstanding principal balance owed on this mortgage, when the Plaintiff took out the loan, they borrowed $50,000.  This mortgage was executed on May 5, 2006 and recorded with the Cook County Recorder of Deeds on May 26, 2006 as document number 06142621053.

13.     The balance due on the primary mortgage ($242,894.83) exceeds the fair market value of the Plaintiffs' residence ($165,000).

### Count I – Determination of Secured Status

14.     The Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 13 *supra* as though fully set forth herein.

15.     Section 506(a) of the Bankruptcy Code provides that a lien is allowed as a secured claim only to the extent of the value of the lien holder's interest in the Bankruptcy Estate's interest in the collateral.  To the extent that the collateral securing the lien is worth less than the amount of the lien, it is unsecured.

16.     Section 506(d) provides that if a lien is not secured as provided by Section 506(a) then there can be no allowed secured claim in favor of the lien holder.

17.     Because the fair market value of the Plaintiff's residence ($165,000) is less than the balance due on the primary mortgage ($242,894.83), the Defendant does not have a secured claim under Section 506(a).  Because the Defendant does not have a secured claim under Section 506(a), there can be no allowed secured claim under Section 506(d).

18.     Without an allowed (or allowable) secured claim under Section 506(d), the mortgage held by the Defendant is unsecured.

## Prayer for Relief

WHEREFORE, the Plaintiffs, Alejandro Palomar and Rafaela Palomar, by and through Jonathan D. Parker, one of their attorneys at Geraci Law L.L.C. respectfully request that this Court enter an order:

A.    Declaring the lien held by First American Bank to be wholly unsecured

B.    Ordering First American Bank to record a release of its lien with the Cook County Recorder of Deeds within 14 days from the entry of the judgment.



Respectfully Submitted: <u>Alejandro Palomar and Rafaela Palomar</u>

By: <u>*/s/ Jonathan D. Parker*</u>
Jonathan D. Parker

And

<u>*/s/ Nathan E. Curtis*</u>
Nathan E. Curtis



Geraci Law L.L.C.
Attorneys for Plaintiffs
55 E. Monroe St., Suite 3400
Chicago, IL 60603
Ph: 888-844-0111
Fax: 877-277-1960
Email: par@geracilaw.com



Adversary Complaint to Determine Nature and Extent of Lien
4

ItROA 11 A 1792gt

# INVOICE

**FROM:**
Nomadic Appraisals
638 N. Franklin Ave.
Palatine, IL 60067

Telephone Number: 847-343-0804        Fax Number:

| INVOICE NUMBER |
|---|
| 1108020 |

| DATES | |
|---|---|
| Invoice Date: | 8/20/2011 |
| Due Date: | |

| REFERENCE | |
|---|---|
| Internal Order #: | |
| Lender Case #: | |
| Client File #: | |
| FHA/VA Case #: | |
| Main File # on form: | 1108020 |
| Other File # on form: | |
| Federal Tax ID: | |
| Employer ID: | |

**TO:**
Rafaela & Alejandro Palomar

,

E-Mail:
Telephone Number:        Fax Number:
Alternate Number:

## DESCRIPTION

| | | | |
|---|---|---|---|
| **Lender:** | Rafaela & Alejandro Palomar | **Client:** | Rafaela & Alejandro Palomar |
| **Purchaser/Borrower:** | Rafaela & Alejandro Palomar | | |
| **Property Address:** | 1937 Clinton Ave | | |
| **City:** | Berwyn | | |
| **County:** | Cook | **State:** IL | **Zip:** 60402 |
| **Legal Description:** | See Title Policy | | |

## FEES / AMOUNT

| | AMOUNT |
|---|---|
| | 300.00 |
| **SUBTOTAL** | 300.00 |

## PAYMENTS / AMOUNT

| | AMOUNT |
|---|---|
| Check #:    Date:    Description: | |
| Check #:    Date:    Description: | |
| Check #:    Date:    Description: | |
| **SUBTOTAL** | |

| Paid In Full | **TOTAL DUE** | $ | 0 |
|---|---|---|---|

## Uniform Residential Appraisal Report

File # 1108020

| | |
|---|---|
| The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property. | |

**SUBJECT**

| | |
|---|---|
| Property Address 1937 Clinton Ave | City Berwyn | State IL | Zip Code 60402 |
| Borrower Rafaela & Alejandro Palomar | Owner of Public Record Rafaela & Alejandro Palomar | County Cook |
| Legal Description See Title Policy | |
| Assessor's Parcel # 16-19-321-014-0000 | Tax Year 2009 | R.E. Taxes $ 5,032 |
| Neighborhood Name None | Map Reference 16974 | Census Tract 8148.00 |
| Occupant ☒ Owner ☐ Tenant ☐ Vacant | Special Assessments $ N/a | ☐ PUD HOA $ N/a | ☐ per year ☐ per month |
| Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe) | |
| Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Market Value | |
| Lender/Client Rafaela & Alejandro Palomar | Address |
| Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No | |
| Report data source(s) used, offering price(s), and date(s). Mlsni/Assessor | |

**CONTRACT**

| | |
|---|---|
| I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. N/A | |
| Contract Price $ NA Date of Contract NA Is the property seller the owner of public record? ☐ Yes ☐ No Data Source(s) Assessor | |
| Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No | |
| If Yes, report the total dollar amount and describe the items to be paid. N/a | |

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % |
|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | | PRICE $ (000) | AGE (yrs) | One-Unit 30 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | | | 2-4 Unit 20 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | | 50 Low New | | Multi-Family 30 % |
| Neighborhood Boundaries The City of Berwyn. | | | | | | 279+ High 100+ | | Commercial 10 % |
| | | | | | | 181 Pred. 60 | | Other 10 % |
| Neighborhood Description Good employment stability, convenience to schools, adequacy of utilities, police and fire protection and general appearance of properties. Immediate neighborhood composed of single family dwellings with a mixture of styles, predominant style is residential. | | | | | | | | |
| Market Conditions (including support for the above conclusions) Declining market due to current market conditions. Interest rates range from 4.5 - 9.5%. Discount points are negotiated between buyers and sellers, but recently with the rates, this has not been necessary. | | | | | | | | |

**SITE**

| | |
|---|---|
| Dimensions Per Assessor | Area 4,719 sf | Shape Rectangular | View Residential |
| Specific Zoning Classification A1 | Zoning Description Single Family Residential |
| Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe) | |
| Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe | |

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ | Water | ☒ | ☐ | Street Asphalt | ☒ | ☐ |
| Gas | ☒ | ☐ | Sanitary Sewer | ☒ | ☐ | Alley None | ☐ | ☐ |

| | |
|---|---|
| FEMA Special Flood Hazard Area ☐ Yes ☒ No FEMA Flood Zone X FEMA Map # 17031C0485J FEMA Map Date 8/19/2008 | |
| Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe | |
| Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe | |
| This appraiser is not aware of and did not discover any adverse environmental conditions in the normal inspection of the property. However, we caution the user of this report that we are not environmental engineers and are not experts in this field. | |

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description materials/condition | | Interior materials/condition | |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☐ Concrete Slab ☐ Crawl Space | | Foundation Walls Poured Concrete/Av | | Floors Car/Vinyl/Avg | |
| # of Stories 1.5 | | ☒ Full Basement ☐ Partial Basement | | Exterior Walls Brick/Avg | | Walls Drywall/Avg | |
| Type ☐ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area 1,426 sq.ft. | | Roof Surface Asphalt/Avg | | Trim/Finish Stained/Avg | |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Basement Finish 80 % | | Gutters & Downspouts Aluminum/Avg | | Bath Floor Vinyl/Avg | |
| Design (Style) Bunglaow | | ☒ Outside Entry/Exit ☐ Sump Pump | | Window Type Dh/Avg | | Bath Wainscot Fiberglass/Avg | |
| Year Built 1926 | | Evidence of ☐ Infestation | | Storm Sash/Insulated Yes/Avg | | Car Storage ☐ None | |
| Effective Age (Yrs) 20 | | ☐ Dampness ☐ Settlement | | Screens Yes/Avg | | ☐ Driveway # of Cars None | |
| Attic ☐ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | Amenities ☐ Woodstove(s) # | | Driveway Surface None | |
| ☐ Drop Stair ☐ Stairs | | ☐ Other Fuel Gas | | ☐ Fireplace(s) # ☐ Fence | | ☒ Garage # of Cars 2 | |
| ☐ Floor ☐ Scuttle | | Cooling ☒ Central Air Conditioning | | ☐ Patio/Deck ☐ Porch | | ☐ Carport # of Cars | |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | ☐ Pool ☐ Other | | ☐ Att. ☐ Det. ☐ Built-in | |
| Appliances ☒ Refrigerator ☒ Range/Oven ☐ Dishwasher ☐ Disposal ☐ Microwave ☒ Washer/Dryer ☐ Other (describe) | | | | | | | |
| Finished area above grade contains: 9 Rooms 4 Bedrooms 1 Bath(s) 2,016 Square Feet of Gross Living Area Above Grade | | | | | | | |
| Additional features (special energy efficient items, etc.). Typical energy efficient items. | | | | | | | |
| Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). The subject is considered to be in avg condition with avg updating. | | | | | | | |
| Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe | | | | | | | |
| Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe | | | | | | | |

| | | |
|---|---|---|
| Freddie Mac Form 70 March 2005 | Page 1 of 6 | Fannie Mae Form 1004 March 2005 |

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

ltROA 11 A 1792gt

## Uniform Residential Appraisal Report

File # 1108020

| There are | 23 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 61,500 to $ 265,000 . |
| There are | 24 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 68,000 to $ 279,900 . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1937 Clinton Ave | 1922 Maple Ave. | | 1812 S Wenonah Ave | | 1504 S Clinton Ave. | |
| | Berwyn, IL 60402 | Berwyn | | Berwyn | | Berwyn | |
| Proximity to Subject | | 0.29 miles W | | 0.19 miles NW | | 0.42 miles N | |
| Sale Price | $ NA | | $ 183,500 | | $ 175,000 | | $ 165,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 103.09 sq.ft. | | $ 87.50 sq.ft. | | $ 99.46 sq.ft. | |
| Data Source(s) | | Mlsni: 07772599 | | Mlsni: 07697680 | | Mlsni: 07761681 | |
| Verification Source(s) | | Mlsni/Assessor | | Mlsni/Assessor | | Mlsni/Assessor | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Conventional D.O.M 32 | | Conventional D.O.M 59 | | Conventional D.O.M 73 | |
| Date of Sale/Time | | 7/1/2011 | | 7/1/2011 | | 6/28/2011 | |
| Location | Average | Average | | Average | | Average | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 4,719 sf | 4653 sf | | 4080 sf | | 6800 sf | -10,000 |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | Bunglaow | Bunglaow | | Bunglaow | | Bunglaow | |
| Quality of Construction | Brick/Avg | Brick/Avg | | Brick/Avg | | Brick/Avg | |
| Actual Age | 1926 | 1926 | | 1927 | | 1927 | |
| Condition | Average | Average | | Average | | Average | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 9 4 1 | 9 4 1 | | 8 4 1 | | 7 4 2 | -5,000 |
| Gross Living Area | 2,016 sq.ft. | 1,780 sq.ft. | +5,900 | 2,000 sq.ft. | 0 | 1,659 sq.ft. | +8,925 |
| Basement & Finished Rooms Below Grade | 1,426 Sq.Ft. Finished w. Bath | Full Finished w. Bath | | Full Finished w. Bath | | Full Unfinished | +10,000 |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Hw/Window | Hw/None | | Fa/Cac | -5,000 | Fa/Cac | -5,000 |
| Energy Efficient Items | Typical | Typical | | Typical | | Typical | |
| Garage/Carport | Garage 2 | Garage 2 | | Garage 2 | | Garage 2 | |
| Porch/Patio/Deck | Deck | Patio | | Patio | | Patio | |
| Updating | Average | Average+ | -10,000 | Average+ | -10,000 | Average | |
| Fp/Amenities | None | None | | None | | None | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -4,100 | ☐ + ☒ - | $ -15,000 | ☐ + ☒ - | $ -1,075 |
| Adjusted Sale Price of Comparables | | Net Adj. 2.2 % Gross Adj. 8.7 % | $ 179,400 | Net Adj. 8.6 % Gross Adj. 8.6 % | $ 160,000 | Net Adj. 0.7 % Gross Adj. 23.6 % | $ 163,925 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) Mlsni/Assessor
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s) Mlsni/Assessor
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | None | None | None | None |
| Price of Prior Sale/Transfer | None | None | None | None |
| Data Source(s) | Mlsni/Assessor | Mlsni/Assessor | Mlsni/Assessor | Mlsni/Assessor |
| Effective Date of Data Source(s) | 8/19/2011 | 8/19/2011 | 8/19/2011 | 8/19/2011 |

Analysis of prior sale or transfer history of the subject property and comparable sales    There has been no other listing or sale of the subject in the past 12 months.

Summary of Sales Comparison Approach    See Addendum.

Indicated Value by Sales Comparison Approach $ 165,000

Indicated Value by: Sales Comparison Approach $ 165,000    Cost Approach (if developed) $    Income Approach (if developed) $

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 165,000 , as of August 19, 2011 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005    Page 2 of 6    Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

ltROA 11 A 1792gt

Appx. 7

# Uniform Residential Appraisal Report

**File # 1108020**

ADDITIONAL COMMENTS

Electronic Transmission:  This appraisal, if transmitted by electronic means, meets applicable USPAP reporting requirements as adopted by the Appraisal Standards Board using computer software which identifies any transmission errors during the transmission process, confirms date, time and quantity of data transmitted/received and protects signature integrity (only the appraiser(s) maintain control of the signature by means of passwords and/or hardware devices).  Electronically affixing a signature to a report carries the same level of authenticity and responsibility as an ink signature on a paper copy report ( a paper copy report transmitted by a facsimile with hand written mark of signature does not constitute electronic transmission).

Conditions of Appraisal:
The appraisal was made from interior and exterior inspection of the subject property as well as analysis of the market area.  No personal property, fixtures or intangible items conveyed, add no value and are not made part of this appraisal.  No liability is assumed for the structural or mechanical elements of the property.  This summary report is intended for the use by the homeowner for informational purposes only.  This report is not intended for any other use.

Appraiser Competence:
The appraiser attests that he has the requisite knowledge and experience necessary to complete this assignment with professional competence.  This appraiser has over 8 years of appraisal experience in the subject market area and is familiar with the property type reflected in this assignment.

Sales in the subject area are typically arms-length without seller concessions.

* All utilities was on and in working order at time of appraisal.

* 10% other land uses include vacant land, parks, etc..

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)   N/A

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | =$ |
|---|---|---|---|---|
| Source of cost data | DWELLING | Sq.Ft. @ $ | | =$ |
| Quality rating from cost service        Effective date of cost data | | Sq.Ft. @ $ | | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | | =$ |
| N/A | Garage/Carport | Sq.Ft. @ $ | | =$ |
| | Total Estimate of Cost-New | | | =$ |
| | Less        Physical | Functional | External | |
| | Depreciation | | | =$(          ) |
| | Depreciated Cost of Improvements | | | =$ |
| | "As-is" Value of Site Improvements | | | =$ |
| Estimated Remaining Economic Life (HUD and VA only)           N/A Years | INDICATED VALUE BY COST APPROACH | | | =$ |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $      N/A      X Gross Rent Multiplier      N/A      = $ | Indicated Value by Income Approach |
|---|---|

Summary of Income Approach (including support for market rent and GRM)      N/A

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☐ No  Unit type(s)  ☐ Detached  ☐ Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.
Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion.
Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source
Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes  ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

ItROA 11 A 1792gt

Appx. 8

# Uniform Residential Appraisal Report

File # 1108020

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

## Uniform Residential Appraisal Report

File # 1108020

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

ltROA 11 A 1792gt

Appx. 10

## Uniform Residential Appraisal Report

File # 1108020

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:**  The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  James Clugh | Name |
| Company Name  Nomadic Appraisals | Company Name |
| Company Address  638 N. Franklin Ave., , Palatine, IL 60067 | Company Address |
| Telephone Number  847-343-0804 | Telephone Number |
| Email Address  jim@nomadicappraisals.com | Email Address |
| Date of Signature and Report  August 20, 2011 | Date of Signature |
| Effective Date of Appraisal  August 19, 2011 | State Certification # |
| State Certification #  556.003711 | or State License # |
| or State License # | State |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License |
| State  IL | |
| Expiration Date of Certification or License  9/30/2011 | SUBJECT PROPERTY |

**ADDRESS OF PROPERTY APPRAISED**

1937 Clinton Ave
Berwyn, IL 60402

APPRAISED VALUE OF SUBJECT PROPERTY $   165,000

**LENDER/CLIENT**

Name
Company Name  Rafaela & Alejandro Palomar
Company Address

Email Address

**SUBJECT PROPERTY**

☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
    Date of Inspection _____
☐ Did inspect interior and exterior of subject property
    Date of Inspection _____

**COMPARABLE SALES**

☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
    Date of Inspection _____

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

ltROA 11 A 1792gt

Appx. 11

**Supplemental Addendum**

File No. 1108020

| Borrower/Client | Rafaela & Alejandro Palomar | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1937 Clinton Ave | | | | | |
| City | Berwyn | County | Cook | State | IL | Zip Code 60402 |
| Lender | Rafaela & Alejandro Palomar | | | | | |

• **URAR : Sales Comparison Analysis - Summary of Sales Comparison Approach**

"Comparable Search and Results"

The appraiser has attempted to display comparable sales that closed within the past 90 days, within one mile, bracketing GLA and room count, within 20% of the predominate for the neighborhood market, and similar in style of living to the subject. All available comparables have been reviewed and reconciled within the researched range listed at the top of page #2 of the report. The initial research may result in some properties that were not considered best comparable in similarity to the subject property. The search was then expanded to transaction dates within the past 6-12 months and within .75 miles of the subject property using the most similar property characteristics. In the expanded search the BEST available similar characteristic comparables are chosen to be reconciled and adjusted accordingly. The 4 properties (3 sales and 1 current market listings) are considered, the Best available and Most comparable, therefore included in this appraisal report. All adjustments made for comparable dissimilarities are market derived according to FNMA guidelines. Comparable adjustments are made as warranted when market research deems verifiable, justifiable and creditable. Please note that AVM data may not be deemed as arms length reliable or verifiable subject similar data and may or may not be included within sales range listed on the top of page #2 of the appraisal report."

# Uniform Residential Appraisal Report

File # 1108020

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 1937 Clinton Ave Berwyn, IL 60402 | 1921 S Maple Ave Berwyn | | | | | |
| Proximity to Subject | | 0.27 miles W | | | | | |
| Sale Price | $ NA | | $ 179,900 | | $ | | $ |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 102.92 sq.ft. | | $ sq.ft. | | $ sq.ft. | |
| Data Source(s) | | Mlsni: 07817122 | | | | | |
| Verification Source(s) | | Mlsni/Assessor | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Conventional D.O.M 86 | | | | | |
| Date of Sale/Time | | Active | -7,000 | | | | |
| Location | Average | Average | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | 4,719 sf | 4080 sf | | | | | |
| View | Residential | Residential | | | | | |
| Design (Style) | Bunglaow | Bungalow | | | | | |
| Quality of Construction | Brick/Avg | Brick/Avg | | | | | |
| Actual Age | 1926 | 1926 | | | | | |
| Condition | Average | Average | | | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 9 4 1 | 9 4 1.5 | -2,500 | | | | |
| Gross Living Area | 2,016 sq.ft. | 1,748 sq.ft. | +6,700 | sq.ft. | | sq.ft. | |
| Basement & Finished Rooms Below Grade | 1,426 Sq.Ft. Finished w. Bath | Full Finished w. Bath | | | | | |
| Functional Utility | Average | Average | | | | | |
| Heating/Cooling | Hw/Window | Fa/Cac | -5,000 | | | | |
| Energy Efficient Items | Typical | Typical | | | | | |
| Garage/Carport | Garage 2 | Garage 1 | +5,000 | | | | |
| Porch/Patio/Deck | Deck | Balcony | | | | | |
| Updating | Average | Average+ | -10,000 | | | | |
| Fp/Amenities | None | None | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - $ | -12,800 | ☐ + ☐ - $ | | ☐ + ☐ - $ | |
| Adjusted Sale Price of Comparables | | Net Adj. 7.1 % Gross Adj. 20.1 % $ | 167,100 | Net Adj. % Gross Adj. % $ | | Net Adj. % Gross Adj. % $ | |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | None | None | | |
| Price of Prior Sale/Transfer | None | None | | |
| Data Source(s) | Mlsni/Assessor | Mlsni/Assessor | | |
| Effective Date of Data Source(s) | 8/19/2011 | 8/19/2011 | | |

Analysis of prior sale or transfer history of the subject property and comparable sales

Analysis/Comments

ANALYSIS / COMMENTS

Freddie Mac Form 70 March 2005                                                                 Fannie Mae Form 1004 March 2005

## Market Conditions Addendum to the Appraisal Report

File No.  1108020

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| Property Address | 1937 Clinton Ave | City Berwyn | State IL | ZIP Code 60402 |
|---|---|---|---|---|

Borrower  Rafaela & Alejandro Palomar

**Instructions:** The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 11 | 5 | 8 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | 1.83 | 1.67 | 2.67 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Total # of Comparable Active Listings | Not Available | Not Available | 23 | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | Not Available | Not Available | 8.6 | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
| Median Comparable Sale Price | 200,000 | 100,100 | 170,000 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 11 | 84 | 102 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Median Comparable List Price | 200,000 | 88,000 | 177,500 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Median Comparable Listings Days on Market | Not Available | Not Available | 195 | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | 100% | 114% | 96% | ☐ Declining | ☐ Stable | ☒ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | | ☐ Yes | ☒ No | ☐ Declining | ☒ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).    Sales in the subject area are sold typically without seller concessions.

Are foreclosure sales (REO sales) a factor in the market?  ☒ Yes   ☐ No   If yes, explain (including the trends in listings and sales of foreclosed properties).
Foreclosure sales in the subject area is effecting values due to normal arm's-length sales having to complete with REO sales.   There was numerous active and closed REO/short sales in the subject area.

Cite data sources for above information.     MRED mulitple listing service.  Boxes marked "Not Available" was due to data being incomplete and unreliable due to MLS limitations.  Per Fannie Mae, extraordinary efforts to extract data is NOT required.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.
Sales appear to be increasing due to seasonal fluctuations.   Values appear to be declining versus months 7-12 and increasing verusus months 4-6.  Overall values are considered to be declining due to oversupply and REO impact.

**If the subject is a unit in a condominium or cooperative project , complete the following:**    Project Name:

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project?  ☐ Yes   ☐ No   If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

| Signature | | Signature | |
|---|---|---|---|
| Appraiser Name  James Chung | | Supervisory Appraiser Name | |
| Company Name  Nomadic Appraisals | | Company Name | |
| Company Address    638 N. Franklin Ave.,  , Palatine, IL 60067 | | Company Address | |
| State License/Certification #  556.003711  State   IL | | State License/Certification #  State | |
| Email Address  jim@nomadicappraisals.com | | Email Address | |

Freddie Mac Form 71  March 2009              Page 1 of 1              Fannie Mae Form 1004MC  March 2009

Form 1004MC2 – "WinTOTAL" appraisal software by a la mode, inc. – 1-800-ALAMODE

ltROA 11 A 1792gt

Appx. 14

## Subject Photo Page

| Borrower/Client | Rafaela & Alejandro Palomar | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1937 Clinton Ave | | | | | |
| City | Berwyn | County | Cook | State | IL | Zip Code  60402 |
| Lender | Rafaela & Alejandro Palomar | | | | | |



### Subject Front

| | |
|---|---|
| 1937 Clinton Ave | |
| Sales Price | NA |
| Gross Living Area | 2,016 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 1 |
| Location | Average |
| View | Residential |
| Site | 4,719 sf |
| Quality | Brick/Avg |
| Age | 1926 |



### Subject Rear



### Subject Street

## Photograph Addendum

| Borrower/Client | Rafaela & Alejandro Palomar | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1937 Clinton Ave | | | | | |
| City | Berwyn | County | Cook | State | IL | Zip Code 60402 |
| Lender | Rafaela & Alejandro Palomar | | | | | |



## Subject Interior Photo Page

| Borrower/Client | Rafaela & Alejandro Palomar | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1937 Clinton Ave | | | | | | |
| City | Berwyn | County | Cook | State | IL | Zip Code | 60402 |
| Lender | Rafaela & Alejandro Palomar | | | | | | |



### Subject Interior

| | |
|---|---|
| 1937 Clinton Ave | |
| Sales Price | NA |
| Gross Living Area | 2,016 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 1 |
| Location | Average |
| View | Residential |
| Site | 4,719 sf |
| Quality | Brick/Avg |
| Age | 1926 |



### Subject Interior



### Subject Interior

## Subject Interior Photo Page

| | |
|---|---|
| Borrower/Client | Rafaela & Alejandro Palomar |
| Property Address | 1937 Clinton Ave |
| City | Berwyn | County | Cook | State | IL | Zip Code | 60402 |
| Lender | Rafaela & Alejandro Palomar |



### Subject Interior

| | |
|---|---|
| 1937 Clinton Ave | |
| Sales Price | NA |
| Gross Living Area | 2,016 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 1 |
| Location | Average |
| View | Residential |
| Site | 4,719 sf |
| Quality | Brick/Avg |
| Age | 1926 |



### Subject Interior



### Subject Interior

### Subject Interior Photo Page

| | |
|---|---|
| Borrower/Client | Rafaela & Alejandro Palomar |
| Property Address | 1937 Clinton Ave |
| City Berwyn | County Cook State IL Zip Code 60402 |
| Lender | Rafaela & Alejandro Palomar |



**Subject Interior**

| | |
|---|---|
| | 1937 Clinton Ave |
| Sales Price | NA |
| Gross Living Area | 2,016 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 1 |
| Location | Average |
| View | Residential |
| Site | 4,719 sf |
| Quality | Brick/Avg |
| Age | 1926 |



**Subject Interior**



**Subject Interior**



## Comparable Photo Page

| Borrower/Client | Rafaela & Alejandro Palomar | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1937 Clinton Ave | | | | | |
| City | Berwyn | County | Cook | State | IL | Zip Code 60402 |
| Lender | Rafaela & Alejandro Palomar | | | | | |



### Comparable 1

1922 Maple Ave.

| Prox. to Subject | 0.29 miles W |
|---|---|
| Sales Price | 183,500 |
| Gross Living Area | 1,780 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 1 |
| Location | Average |
| View | Residential |
| Site | 4653 sf |
| Quality | Brick/Avg |
| Age | 1926 |



### Comparable 2

1812 S Wenonah Ave

| Prox. to Subject | 0.19 miles NW |
|---|---|
| Sales Price | 175,000 |
| Gross Living Area | 2,000 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 1 |
| Location | Average |
| View | Residential |
| Site | 4080 sf |
| Quality | Brick/Avg |
| Age | 1927 |



### Comparable 3

1504 S Clinton Ave.

| Prox. to Subject | 0.42 miles N |
|---|---|
| Sales Price | 165,000 |
| Gross Living Area | 1,659 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2 |
| Location | Average |
| View | Residential |
| Site | 6800 sf |
| Quality | Brick/Avg |
| Age | 1927 |

## Comparable Photo Page

| Borrower/Client | Rafaela & Alejandro Palomar | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1937 Clinton Ave | | | | | |
| City | Berwyn | County | Cook | State | IL | Zip Code 60402 |
| Lender | Rafaela & Alejandro Palomar | | | | | |



**Comparable 4**

| | |
|---|---|
| 1921 S Maple Ave | |
| Prox. to Subject | 0.27 miles W |
| Sales Price | 179,900 |
| Gross Living Area | 1,748 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 1.5 |
| Location | Average |
| View | Residential |
| Site | 4080 sf |
| Quality | Brick/Avg |
| Age | 1926 |

**Comparable 5**

| | |
|---|---|
| Prox. to Subject | |
| Sales Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

**Comparable 6**

| | |
|---|---|
| Prox. to Subject | |
| Sales Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |



## Building Sketch

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower/Client | Rafaela & Alejandro Palomar | | | | | | |
| Property Address | 1937 Clinton Ave | | | | | | |
| City | Berwyn | County | Cook | | State | IL | Zip Code | 60402 |
| Lender | Rafaela & Alejandro Palomar | | | | | | |



## Location Map

| Borrower/Client | Rafaela & Alejandro Palomar | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1937 Clinton Ave | | | | | | |
| City | Berwyn | County | Cook | State | IL | Zip Code | 60402 |
| Lender | Rafaela & Alejandro Palomar | | | | | | |



# Account Statement

## Customer Service Information



9-769-00865-0048443-010-1-000-000-000-000

PALOMAR, ALEJANDRO
PALOMAR, RAFAELA
1937 CLINTON AVE
BERWYN IL  60402-1642

| | |
|---|---|
| ✉ Write To: | **IBM Lender Business Process Services, Inc.** P.O. Box 4121 Beaverton, OR 97076-4121 |
| 🕐 Business Hours: | **Mon-Thu 5am to 9pm; Fri 5am to 6pm Sat 6am to 12pm; Sun 11am to 5pm PT** |
| ☎ For Information: | **Call: 866.570.5277 Fax: 866.578.5277** |
| 💻 OR Visit Us Online: | **www.lbps.com** |

*See reverse side for additional important information*

**Borrower Information**
Phone – Home:
Phone – Work:

Property Address:    1937 CLINTON AVE
BERWYN, IL 60402-1642

---

## Account Information

**Loan Number: 12443946**

Statement Date:        11/16/10

Interest Rate:         5.875%

Payment Breakdown:
Principal & Interest: $     1,539.78
Escrow:               $       792.77
Other:                $         0.00
                      ---------------
Total:                $     2,332.55

| | Year To Date Interest Paid | Year To Date Late Charges Paid | Year To Date Taxes Paid | Year To Date Principal Paid |
|---|---|---|---|---|
| | 0.00 | 0.00 | 0.00 | 0.00 |
| | *New Principal Balance** | *New Escrow Balance* | *New Interest Arrearage Balance* | *New Escrow Arrearage Balance* |
| | 242,894.86 | -85.89 | 0.00 | 0.00 |

*\*This is not a payoff figure. It does not include interest, fees, and costs.*

---

## Activity Since Your Last Statement

| Date | Description | Principal | Interest | Escrow | Late Charge/ Other Fees | Other | Suspense | Total |
|---|---|---|---|---|---|---|---|---|
| 10/27/10 | ESCROW - INSURANCE | .00 | .00 | -145.33 | .00 | .00 | .00 | -145.33 |

L B P S ™

---

## Important Messages

NOTICE - CHECK PAYMENTS PROCESSED AS ELECTRONIC FUND TRANSFERS
When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction.

769-2044-0710F

## Please visit our website at www.lbps.com

*Please return this coupon with your payment and include your loan number on your payment.*

Appx. 25

## United Stated Bankruptcy Court, Northern District of Illinois

| Name of Assigned Judge | Susan Pierson Sonderby | Case No. | 11 B 30585 |
|---|---|---|---|
| **DATE** | | **ADVERSARY NO.** | 11 A 01792 |
| **CASE TITLE** | Alejandro Palomar, Sr. and Rafaela Palomar; Alejandro Palomar, Sr. and Rafaela Palomar v. First American Bank | | |
| **TITLE OF ORDER** | Order Denying Plaintiffs' Motion for Default and Default Judgment and Dismissing Adversary Proceeding | | |

#### DOCKET ENTRY TEXT

The Motion of Plaintiffs for Default and Default Judgment (docket no. 6) is denied. The adversary proceeding is dismissed.
[For further details see text below.]

---

### STATEMENT

This cause comes to be heard on the Motion of Plaintiffs for Default and Default Judgment. On July 27, 2011 (the "Petition Date"), Alejandro Palomar, Sr. and Rafaela Palomar (the "Debtors" or "Plaintiffs") filed a voluntary joint petition under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). They own a residence located in Berwyn, Illinois, which was valued at $165,000 as of the Petition Date. The house is subject to a first priority mortgage lien in favor of LBPS which secures the financial obligations of the Debtors to LBPS. As of the Petition Date those obligations totaled $242,894. The Debtors also owe at least $50,000 to First American Bank, which obligation is secured by a second priority mortgage on the house. The chapter 7 trustee of the Debtors' bankruptcy estate filed a Report of No Distribution on August 25, 2011, wherein he reported that after diligent inquiry into the financial affairs of the Debtors that there is no property available for distribution from the estate over and above that exempted by law. The claims register maintained by the clerk of the court indicates that no proofs of claims were filed in this bankruptcy case. The bankruptcy case was closed on December 1, 2011, after a discharge was granted for both Debtors.

# STATEMENT

On August 24, 2011, the Debtors filed an adversary complaint against First American Bank asking this court to determine, pursuant to § 506(a) of the Code, that the value of First American Bank's secured claim is zero given that the home's value is fully encumbered by the prior mortgage. Moreover, the Debtors assert that since First American Bank's claim is wholly unsecured, the entire lien should be declared void by this court based on section 506(d) of the Code. Finally, the Debtors ask the court to require First American Bank to record a release of its mortgage within fourteen days of the declaration.

On August 24, 2011, a summons was issued and served on First American Bank in accordance with Fed. R. Bankr. P. 7004(h). First American Bank has not answered or otherwise plead.

On October 7, 2011, the Plaintiffs filed a Motion for Default and Default Judgment followed later by a supporting Memorandum of Law. As noted by the Seventh Circuit Court of Appeals, "[t]here are two stages in a default proceeding: the establishment of the default, and the actual entry of a default judgment. Once the default is established, and thus liability, the plaintiff still must establish his entitlement to the relief he seeks." In re Catt, 368 F.3d 789, 793 (7th Cir. 2004); see also Pope v. U. S., 323 U.S. 1, 12, 65 S.Ct. 16, 89 L.Ed. 3 (1944). By not timely responding to the complaint, the defendant admits its well-pleaded allegations. Fed. R. Civ. P. 8(b)(6), made applicable herein by Fed. R. Bankr. P. 7008(a). Legal conclusions, however, are not admitted by default. In re Paul, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001). Rather, the court decides, even where the factual allegations are admitted by default, whether the entry of a default judgment is appropriate as a matter of law. Id. "The court must consider whether the plaintiff's allegations are sufficient to state a claim for relief. If the plaintiff's claim lacks merit and is unsupported by the law, the court may deny a motion for default judgment despite the technical default." In re Park, 272 B.R. 323, 329 (Bankr. D.N.J. 2001)(quoting In re Wall, 127 B.R. 353, 355 (Bankr. E.D. Va.1991)). In short, "[j]udgment does not automatically follow after the entry of default." Paul, 266 B.R. at 693.

In the adversary complaint, which was filed before the bankruptcy case was closed, Debtors make a blanket allegation that "this Court has jurisdiction pursuant to 28 U.S.C. § 1334(a), (b)." Debtors further allege that the proceeding is a core matter pursuant to 28 U.S.C. § 157(b).

Contrary to Debtors' allegation, this court does not have jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(a), as that statute governs jurisdiction over bankruptcy cases, not adversary proceedings. Subsection (b) of section 1334, however, governs jurisdiction over adversary proceedings. It provides that district courts have original, but not exclusive, jurisdiction over civil proceedings "arising under," "arising in," or "related to" bankruptcy cases. 28 U.S.C. § 1334(b). The District Court for the Northern District of Illinois has exercised its discretion to refer bankruptcy cases and "arising under," "arising in," or "related to" civil proceedings to the bankruptcy judges in this district. 28 U.S.C. § 157(a); Internal Operating Procedure 15.

-2-

## STATEMENT

Debtors do not specify in the complaint or elsewhere whether they believe this adversary proceeding is one "arising under," the Bankruptcy Code, or "arising in" or "related to" the bankruptcy case. A proceeding "arises under" the Bankruptcy Code if it involves an action created by the Bankruptcy Code. In re UAL Corp., 336 B.R. 370, 371-72 (Bankr. N.D. Ill. 2006)(citations omitted). Proceedings "arising in" a bankruptcy case are "generally defined as 'administrative matters that arise only in bankruptcy cases.'" In re Ortiz, 2011 WL 6880651, * 4 (7th Cir. Dec. 30, 2011)(quoting In re Repository Techs., Inc., 601 F.3d 710,719 (7th Cir. 2010))(emphasis in original). A proceeding is "related to" a bankruptcy case if it can exist outside of bankruptcy but "affects the amount of property available for distribution or the allocation of property among creditors." Matter of Xonics, 813 F.2d 127, 131 (7th Cir. 1987).

Once it is established that there is bankruptcy jurisdiction over a civil proceeding because it "arises under," the Bankruptcy Code, or "arises in," or is "related to" the bankruptcy case, the issue becomes whether the bankruptcy judge has authority to enter a final judgment resolving it or whether the bankruptcy judge must make a recommendation to the district court to enter the final judgment. This determination turns on whether the matter is "core" or "non-core." Bankruptcy judges can enter a final judgment in core matters, provided there is no constitutional impediment. See Stern v. Marshall, 131 S.Ct. 2594, 2605, 180 L.Ed.2d 475 (2011). In a non-core proceeding, unless the parties consent to the bankruptcy judge entering final judgments, the bankruptcy judge can only propose findings of fact and conclusions of law to a judge of the district court who enters the final judgment. 28 U.S.C. § 157(c)(1).

A proceeding is core "if it invokes a substantive right provided by the [Bankruptcy Code] or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." Diamond Mortg. Corp. of Illinois v. Sugar, 913 F.2d 1233, 1239 (7th Cir. 1990)(quotation omitted). Indeed, it is now clear that core proceedings can only be those that "arise under" the Bankruptcy Code or "arise in" a bankruptcy case. Stern, 131 S.Ct. at 2603. A non-core proceeding is one that is merely "related to" the bankruptcy case because it "does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy." Matter of Wood, 825 F.2d 90, 97 (5th Cir. 1987).

As noted, the Adversary Complaint seeks a determination of the extent of the defendant's lien on the Debtors' house and the avoidance of that lien. Such a proceeding is within the court's "arising in" jurisdiction. See In re Repository Technologies, Inc., 601 F.3d 710, 719 (7th Cir. 2010)("[C]laims 'arising in' bankruptcy include 'such things as administrative matters, orders to turn over property of the estate and determinations of the validity, extent, or priority of liens.'")(citing 1 Collier on Bankruptcy ¶ 3.01[4][c][iv] at 3-27 (15th ed. rev. 2008)). Because it is a proceeding "arising in' the bankruptcy case, it is a core proceeding.

When the proceeding was filed, this court also had jurisdiction over the property at issue pursuant to 28 U.S.C. § 1334(e)(1)("The district court [or by reference, the bankruptcy court] in

-3-

## STATEMENT

which a [bankruptcy case] is commenced or is pending shall have exclusive jurisdiction — of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate."). If property is sold and leaves the estate, the court loses control over it. Matter of Edwards, 962 F.2d 641, 643 (7th Cir. 1992). At that point, unless the proceeding involving the non estate property implicates another source of bankruptcy jurisdiction, it should be dismissed. See Id. If, however, the property has left the estate because it was abandoned by the trustee to the debtor, the court still has jurisdiction over that property pursuant to 28 U.S.C. 1334(e). In re Lafoon, 278 B.R. 767, 771 (Bankr. E.D. Tenn. 2002).

This matter presents a jurisdictional wrinkle in that during the pendency of the adversary proceeding the underlying "no-asset" bankruptcy case was closed after being fully administered by the chapter 7 trustee. The court does not necessarily lose jurisdiction over adversary proceedings when the bankruptcy case is closed. See Travelers Indem. Co. v. Bailey, 557 U.S. 137, 129 S.Ct. 2195, 2205, 174 L.Ed.2d 99 (2009); In re Crosson, 333 B.R. 794, 800 (Bankr. N.D.Ill. 2005). For example, it has continuing jurisdiction to interpret and enforce its own prior orders. Id. The court may also be able to retain jurisdiction over a related to proceeding "when dictated by judicial economy, fairness and convenience to the parties, and the degree of difficulty of the related legal issue involved." Crosson, 333 B.R. at 800 (citations omitted). None of the grounds for continuing or retained jurisdiction seem to apply here. However, it is within the court's power to reopen the bankruptcy case for among, other reasons, to accord relief to the debtor. 11 U.S.C. § 350(b). For example, closed cases are routinely opened at a debtor's request to allow the debtor to file motions pursuant to section 522(f) of the Bankruptcy Code to avoid judicial liens on property to the extent those liens impair the debtor's exemptions. See In re Mangold, 244 B.R. 901, 904 (Bankr. S.D. Ohio 2000); In re Keenan, 106 B.R. 239, 241 (Bankr. D. Colo. 1989).

Here, the Debtor's house was abandoned to the Debtors and their bankruptcy case was closed. Arguably, the court could reopen the bankruptcy case and regain jurisdiction over the house to accord the relief requested by the Debtors with respect to that house. However, as will now be discussed, the relief the Debtors are requesting (the strip off of a valueless lien) is not available to them, so had a request to reopen been made, the court would not have granted it.

This court has had occasion to address the somewhat controversial issue of whether a chapter 7 debtor can obtain a declaration voiding the mortgage lien of a wholly unsecured creditor and based thereon compel the mortgage holder to release its lien. See In re Immel, 436 B.R. 538 (Bankr. N.D. Ill. 2010). This court's decision in Immel was based primarily on the teachings of the Supreme Court in Dewsnup v. Timm, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), which rejected a chapter 7 debtor's arguments to "strip-down" an undersecured mortgage based on section 506(d). This court in Immel joined the clear majority of courts which have applied the reasoning of Dewsnup to a chapter 7 debtor's request to avoid the lien of the wholly unsecured mortgagee. This court concluded for the reasons set out in detail in Immel, which will not be repeated here, "that the rationale of Dewsnup applies to strip-off requests by chapter 7 debtors with 'equal force and logic.'"

-4-

# STATEMENT

Immel, 436 B.R. at 544 (citing In re Talbert, 344 F.3d 555, 556 (6th Cir. 2003)); see also, Ryan v. Homecomings Financial Network, 253 F.3d 778, 782 (4th Cir. 2001).

Here, the Plaintiffs urge the court to "reconsider its reliance on *Dewsnup,*" arguing that pursuant to the plain language of section 103(a) of the Code, sections 506(a) and (d) apply "equally" to all chapters. Section 103(a) of the Code states, in part, that "chapters 1, 3, and 5 [including section 506] of this title apply in a case under chapter 7, 11, 12, or 13 of this title." 11 U.S.C. § 103(a).

Importantly, the proper application of section 506 depends on a correct reading of its provisions. As noted by the Supreme Court, it is incorrect to read sections 506(a) and (d) to compel a reduction of the mortgage lien to the value of the house in a no-asset chapter 7 case. The Court explained that when a claim "has been 'allowed' pursuant to § 502 of the Code and is secured by a lien with recourse to the underlying collateral, it does not come within the scope of § 506(d), which voids only liens corresponding to claims that have *not* been allowed and secured." Dewsnup, 502 U.S. at 415. In a no-asset chapter 7 case, such as this one, no proofs of claims are filed and thus are not challenged. Immel, 436 B.R. at 540. "Dewsnup teaches that, unless and until there is a claims allowance process, there is no predicate for voiding a lien under § 506(d)." Id, at 543 (quoting In re Laskin, 222 B.R. 872, 876 (9th Cir. BAP 1998)). This result is offensive to the Debtors because to them it renders meaningless section 103's provision that section 5 of the Code applies in chapter 7 cases. The court disagrees. Again, the issue is not whether the section applies, but how it applies and proper application of section 506(d) depends on its proper construction. The Supreme Court in Dewsnup instructed courts how to construe section 506(d) in the context of undersecured claims in a no-asset chapter 7. This court, along with the majority of other courts that have ruled on this issue, has adopted that reading in situations involving wholly unsecured claims in a no-asset chapter 7.

The court also notes that the debtor in Dewsnup appears to have made a similar consistency argument based on section 103(a). See Brief for Petitioner at 16, Dewsnup v. Timm, 1991 WL 52162 (Apr. 26, 1991). Indeed, Justice Scalia mentioned it in his dissent to the opinion of the Court. See Dewsnup, 502 U.S. at 420 (dissent, J. Scalia). The debtor's section 103 argument did not sway the Court to rule in his favor.

The Debtors also argue that it would have been easy for the Court to say in Dewsnup that chapter 7 debtors cannot avoid a wholly unsecured claim and the fact that it did not say that, is proof that Dewsnup is not controlling in this context. The argument is unpersuasive. It sounds like an argument based on statutory construction principles, not about whether reasoning espoused by the Supreme Court in one context can be adopted by lower courts in a different context.

-5-

## STATEMENT

Because the Debtors are requesting relief in this adversary proceeding that is unavailable to them, the court would not reopen the bankruptcy case had such a request been made. There is presently no source of bankruptcy jurisdiction over this adversary proceeding and there is no reason to regain jurisdiction. Accordingly, the default judgment motion is denied and the adversary proceeding is dismissed.

ENTER:

1-24-12

Hon. Susan Pierson Sonderby
United States Bankruptcy Judge

-6-

ItROA 11 A 1792gt

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Gary Feinerman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 12 C 2418 | **DATE** | 10/3/2012 |
| **CASE TITLE** | Palomar, et al. Vs. First American Bank | | |

**DOCKET ENTRY TEXT**

For the reasons set forth in the accompanying Memorandum Opinion and Order, the bankruptcy court's judgment is affirmed.  Status hearing scheduled for 10/22/2012 [8] is stricken.  Civil case closed.

■ [ For further detail see separate order(s).]

Docketing to mail notices.
*Mail AO 450 form.

| | Courtroom Deputy Initials: | JD |
|---|---|---|

12C2418 Palomar, et al. Vs. First American Bank

Page 1 of  1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re ALEJANDRO PALOMAR Sr. and RAFAELA PALOMAR, | ) | 12 C 2418 |
| | ) | |
| Debtors. | ) | Judge Feinerman |
| _____ | ) | |
| | ) | |
| ALEJANDRO PALOMAR Sr. and RAFAELA PALOMAR, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| vs. | ) | Appeal from: |
| | ) | |
| FIRST AMERICAN BANK, | ) | 11 B 30585 |
| | ) | 11 A 1792 |
| Defendant-Appellee. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs-Appellants Alejandro and Rafaela Palomar filed a voluntary joint petition for bankruptcy under Chapter 7 of the Bankruptcy Code and received a discharge in December 2011.  They brought this adversary proceeding in the bankruptcy court against Defendant-Appellee First American Bank, seeking a discharge or "strip off" of First American's second-priority mortgage on their residence.  The value of the residence is $165,000, and it was subject to a first-priority mortgage held by another lender that secures a debt of $242,894.  Doc. 1-3 at 55.  First American's second-priority lien secures an obligation of at least $50,000, and that is the obligation that the Palomars asked the bankruptcy court to discharge.  *Ibid*.  They grounded their request on Bankruptcy Code provisions saying that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property … and is an

-1-

unsecured claim to the extent that the value of such creditor's interest ... is less than the amount

of such allowed claim," 11 U.S.C. § 506(a)(1), and "[t]o the extent that a lien secures a claim

against the debtor that is not an allowed secured claim, such lien is void," with inapplicable

exceptions, 11 U.S.C. § 506(d).  The bankruptcy court, adhering to its decision in *In re Immel*,

436 B.R. 538 (Bankr. N.D. Ill. 2010), held that strip offs are prohibited in Chapter 7 cases and

thus dismissed the adversary proceeding.  Doc. 1-3 at 55-60.

 The Palomars' appeal of the bankruptcy court's judgment presents a single question of

law: May debtors in a Chapter 7 bankruptcy use 11 U.S.C. § 506(d) to "strip off" a junior lien on

their residence where the debt secured by the senior lien exceeds the market value of the

residence?  In *Dewsnup v. Timm*, 502 U.S. 410 (1992), the Supreme Court interpreted the above-

quoted Bankruptcy Code provisions to hold that Chapter 7 debtors may not use section 506(d) to

"strip down" a lien on their residence—that is, to void the lien to the extent that it exceeds the

value of the residence while retaining it to the extent that it does not.  *Id*. at 417.  This appeal

turns on whether *Dewsnup* should be read to also preclude the "stripping off" of a junior

lien—that is, voiding it entirely—where liens of higher priority exceed the value of a Chapter 7

debtor's residence.  In dismissing the Palomars' claim, the bankruptcy court answered in the

affirmative.

 The Seventh Circuit has not addressed the question, though it has often cited *Dewsnup*

for "the principle that (with immaterial exceptions) liens pass through bankruptcy unaffected,"

*Gradel v. Piranha Capital, L.P.*, 495 F.3d 729, 732 (7th Cir. 2007); *see also Cox v. Zale*

*Delaware, Inc.*, 239 F.3d 910, 912 (7th Cir. 2001); *In re Penrod*, 50 F.3d 459, 461 (7th Cir.

1995); *In re CMC Heartland Partners*, 966 F.2d 1143, 1147 (7th Cir. 1992); *In re James Wilson*

*Assocs.*, 965 F.2d 160, 167 (7th Cir. 1992), which would seem to apply as much to a junior lien

as to a senior lien.  The Fourth and Sixth Circuits agree with the bankruptcy court that *Dewsnup*'s determination that stripping down the primary lien on the debtor's residence is impermissible under Chapter 7 applies "with equal force and logic" to the stripping off of a secondary lien.  *In re Talbert*, 344 F.3d 555, 556 (6th Cir. 2003); *see also Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 779 (4th Cir. 2001) ("Because we find that the Supreme Court's reasoning in *Dewsnup* … is equally applicable to 'strip offs' as to 'strip downs,' we hold that a debtor may not strip off an unsecured but allowed lien pursuant to Section 506(d)."); *In re Laskin*, 222 B.R. 872 (B.A.P. 9th Cir. 1998) (same).  This court finds *Ryan* and *Talbert* persuasive, and for the reasons stated therein, the bankruptcy court's judgment is affirmed.

A recent decision of the Eleventh Circuit on analogous facts, *In re McNeal*, 2012 WL 1649853 (11th Cir. May 11, 2012) (per curiam), adopted the position advanced here by the Palomars.  *McNeal* is unpublished and thus non-precedential.  *See* 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").  The *McNeal* panel explained that it was bound to follow a pre-*Dewsnup* Eleventh Circuit decision holding that "strip offs" are permitted in Chapter 7 cases, *Folendore v. U.S. Small Bus. Admin.*, 862 F.2d 1537 (11th Cir. 1989), unless "the intervening Supreme Court decision," *Dewsnup*, was "clearly on point."  *McNeal*, 2012 WL 1649853, at *2.  The panel determined that "[b]ecause *Dewsnup* disallowed only a 'strip down' of a partially secured mortgage lien and did not address a 'strip off' of a wholly unsecured lien, it is not 'clearly on point' with the facts in *Folendore* or with the facts at issue in this appeal."  *Ibid*.  Accordingly, the Eleventh Circuit panel determined that it was bound by *Folendore* and did not consider whether the reasoning of *Dewsnup* (as opposed to its precise holding) would otherwise have

required a different result. *Ibid.* ("that the reasoning of an intervening high court decision is at odds with that of our prior decision is no basis for a panel to depart from our prior decision").

*Folendore* is not binding here, and in light of the particular legal context in which *McNeal* was decided, the decision is not persuasive and does not affect this court's conclusion that the bankruptcy court's judgment should be affirmed.

October 3, 2012

_____
United States District Judge

-4-

# ADDENDUM

STATUTES

**11 U.S.C. § 103(a)**

(a) Except as provided in section 1161 of this title, chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13 of this title, and this chapter, sections 307, 362(o), 555 through 557, and 559 through 562 apply in a case under chapter 15.

**11 U.S.C. § 349(b)**

(b) Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title—

    (1) reinstates—

        (A) any proceeding or custodianship superseded under section 543 of this title;

        (B) any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or preserved under section 510(c)(2), 522(i)(2), or 551 of this title; and

        (C) any lien voided under section 506(d) of this title;

    (2) vacates any order, judgment, or transfer ordered, under section 522(i)(1), 542, 550, or 553 of this title; and

    (3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.

**11 U.S.C. § 350**

(a) After an estate is fully administered and the court has discharged the trustee, the court shall close the case.

(b) A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause.

**11 U.S.C. § 502(a)**

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

**11 U.S.C. § 506(a)**

(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an

unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

(2) If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

## 11 U.S.C. § 506(d)

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—

    (1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

## 11 U.S.C. § 522(c)(2)(A)(ii)

(c) Unless the case is dismissed, property exempted under this section is not liable during or after the case for any debt of the debtor that arose, or that is determined under section 502 of this title as if such debt had arisen, before the commencement of the case, except -

    (1) a debt of a kind specified in paragraph (1) or (5) of section 523(a) (in which case, notwithstanding any provision of applicable nonbankruptcy law to the contrary, such property shall be liable for a debt of a kind specified in section 523(a)(5));

    (2) a debt secured by a lien that is -

        (A)    (i) not avoided under subsection (f) or (g) of this section or under section 544, 545, 547, 548, 549, or 724(a) of this title; and

            (ii) not void under section 506(d) of this title; or

        (B) a tax lien, notice of which is properly filed;

## 11 U.S.C. § 522(f)

(1) Notwithstanding any waiver of exemptions but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an

2

exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

> (A) a judicial lien, other than a judicial lien that secures a debt of a kind that is specified in section 523(a)(5); or
>
> (B) a nonpossessory, nonpurchase-money security interest in any—
>
>> (i) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;
>>
>> (ii) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or
>>
>> (iii) professionally prescribed health aids for the debtor or a dependent of the debtor.

(2)

> (A) For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of—
>
>> (i) the lien;
>>
>> (ii) all other liens on the property; and
>>
>> (iii) the amount of the exemption that the debtor could claim if there were no liens on the property; exceeds the value that the debtor's interest in the property would have in the absence of any liens.
>
> (B) In the case of a property subject to more than 1 lien, a lien that has been avoided shall not be considered in making the calculation under subparagraph (A) with respect to other liens.
>
> (C) This paragraph shall not apply with respect to a judgment arising out of a mortgage foreclosure.

(3) In a case in which State law that is applicable to the debtor—

> (A) permits a person to voluntarily waive a right to claim exemptions under subsection (d) or prohibits a debtor from claiming exemptions under subsection (d); and
>
> (B) either permits the debtor to claim exemptions under State law without limitation in amount, except to the extent that the debtor has permitted the fixing of a consensual lien on any property or prohibits avoidance of a consensual lien on property otherwise eligible to be claimed as exempt property; the debtor may not avoid the fixing of a lien on an interest of the debtor or a dependent of the debtor in property if the lien is a nonpossessory, nonpurchase-money security interest in implements, professional books, or tools of the trade of the debtor or a dependent of the debtor or farm animals or crops of the debtor or a dependent of the debtor to the extent the value of

such implements, professional books, tools of the trade, animals, and crops exceeds $5,000.

(4)

(A) Subject to subparagraph (B), for purposes of paragraph (1)(B), the term "household goods" means—

   (i) clothing;
   (ii) furniture;
   (iii) appliances;
   (iv) 1 radio;
   (v) 1 television;
   (vi) 1 VCR;
   (vii) linens;
   (viii) china;
   (ix) crockery;
   (x) kitchenware;
   (xi) educational materials and educational equipment primarily for the use of minor dependent children of the debtor;
   (xii) medical equipment and supplies;
   (xiii) furniture exclusively for the use of minor children, or elderly or disabled dependents of the debtor;
   (xiv) personal effects (including the toys and hobby equipment of minor dependent children and wedding rings) of the debtor and the dependents of the debtor; and
   (xv) 1 personal computer and related equipment.

(B) The term "household goods" does not include—

   (i) works of art (unless by or of the debtor, or any relative of the debtor);
   (ii) electronic entertainment equipment with a fair market value of more than $500 in the aggregate (except 1 television, 1 radio, and 1 VCR);
   (iii) items acquired as antiques with a fair market value of more than $500 in the aggregate;
   (iv) jewelry with a fair market value of more than $500 in the aggregate (except wedding rings); and
   (v) a computer (except as otherwise provided for in this section), motor vehicle (including a tractor or lawn tractor), boat, or a motorized recreational device, conveyance, vehicle, watercraft, or aircraft.

11 U.S.C. § 551

Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only

with respect to property of the estate.

11 U.S.C. §704(a)

    (a) The trustee shall—

        (1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest;

        (2) be accountable for all property received;

        (3) ensure that the debtor shall perform his intention as specified in section 521(a)(2)(B) of this title;

        (4) investigate the financial affairs of the debtor;

        (5) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;

        (6) if advisable, oppose the discharge of the debtor;

        (7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;

        (8) if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires;

        (9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee;

        (10) if with respect to the debtor there is a claim for a domestic support obligation, provide the applicable notice specified in subsection (c);

        (11) if, at the time of the commencement of the case, the debtor (or any entity designated by the debtor) served as the administrator (as defined in section 3 of the Employee Retirement Income Security Act of 1974) of an employee benefit plan, continue to perform the obligations required of the administrator; and

        (12) use all reasonable and best efforts to transfer patients from a health care business that is in the process of being closed to an appropriate health care business that—

            (A) is in the vicinity of the health care business that is closing;

(B) provides the patient with services that are substantially similar to those provided by the health care business that is in the process of being closed; and
(C) maintains a reasonable quality of care.

11 U.S.C. § 722

An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien in full at the time of redemption.

11 U.S.C. § 1123(b)(5)

(b) Subject to subsection (a) of this section, a plan may—
(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;
(2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;
(3) provide for—
(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;
(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;
(5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and
(6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

11 U.S.C. § 1322(a)(4)

(a) The plan—
(1) shall provide for the submission of all or such portion of future earnings or other future income of the debtor to the

supervision and control of the trustee as is necessary for the execution of the plan;

(2) shall provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title, unless the holder of a particular claim agrees to a different treatment of such claim;

(3) if the plan classifies claims, shall provide the same treatment for each claim within a particular class; and

(4) notwithstanding any other provision of this section, may provide for less than full payment of all amounts owed for a claim entitled to priority under section 507(a)(1)(B) only if the plan provides that all of the debtor's projected disposable income for a 5-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

## 11 U.S.C. § 1322(b)(2)

(b) Subject to subsections (a) and (c) of this section, the plan may—

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

## 11 U.S.C. § 1325(a)(5)(B)

(a) Except as provided in subsection (b), the court shall confirm a plan if—

(1) The plan complies with the provisions of this chapter and with the other applicable provisions of this title;

(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

(3) the plan has been proposed in good faith and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)

(i) the plan provides that—

7

                (I) the holder of such claim retain the lien securing such claim until the earlier of—

                    (aa) the payment of the underlying debt determined under nonbankruptcy law; or

                    (bb) discharge under section 1328; and

                (II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law;

            (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and

            (iii) if—

                (I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and

                (II) the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or

## 28 U.S.C. § 157(a)

    (a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

## 28 U.S.C. § 157(b)

    (b)

        (1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

        (2) Core proceedings include, but are not limited to—

            (A) matters concerning the administration of the estate;

            (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation

of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
(C) counterclaims by the estate against persons filing claims against the estate;
(D) orders in respect to obtaining credit;
(E) orders to turn over property of the estate;
(F) proceedings to determine, avoid, or recover preferences;
(G) motions to terminate, annul, or modify the automatic stay;
(H) proceedings to determine, avoid, or recover fraudulent conveyances;
(I) determinations as to the dischargeability of particular debts;
(J) objections to discharges;
(K) determinations of the validity, extent, or priority of liens;
(L) confirmations of plans;
(M) orders approving the use or lease of property, including the use of cash collateral;
(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;
(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and
(P) recognition of foreign proceedings and other matters under chapter 15 of title 11.
(3) The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.
(4) Non-core proceedings under section 157(b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2).
(5) The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in

which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

**28 U.S.C. § 158(a)(1)**

(a) The district courts of the United States shall have jurisdiction to hear appeals

(1) from final judgments, orders, and decrees;

**28 U.S.C. § 1291**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**28 U.S.C. § 1334**

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

RULES

**Fed.R.Bankr.P. 3007(b)**

(b) DEMAND FOR RELIEF REQUIRING AN ADVERSARY PROCEEDING. A party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding

**Fed.R.Bankr.P. 7001**

An adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings:

(2) a proceeding to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d);

Fed.R.Bankr.P. 7004

(b) SERVICE BY FIRST CLASS MAIL. Except as provided in subdivision (h), in addition to the methods of service authorized by Rule 4(e)–(j) F.R.Civ.P., service may be made within the United States by first class mail postage prepaid as follows:

(3) Upon a domestic or foreign corporation or upon a partnership or other unincorporated association, by mailing a copy of the summons and complaint to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant.

Fed.R.Bankr.P. 8002

(a) FOURTEEN-DAY PERIOD. The notice of appeal shall be filed with the clerk within 14 days of the date of the entry of the judgment, order, or decree appealed from. If a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days of the date on which the first notice of appeal was filed, or within the time otherwise prescribed by this rule, whichever period last expires. A notice of appeal filed after the announcement of a decision or order but before entry of the judgment, order, or decree shall be treated as filed after such entry and on the day thereof. If a notice of appeal is mistakenly filed with the district court or the bankruptcy appellate panel, the clerk of the district court or the clerk of the bankruptcy appellate panel shall note thereon the date on which it was received and transmit it to the clerk and it shall be deemed filed with the clerk on the date so noted.

OTHER REFERENCES

H.R. REP. 95-595, H.R. Rep. No. 595, 95TH Cong., 1ST Sess. 1977, 1978 U.S.C.C.A.N. 5963, 1977 WL 9628 (Leg.Hist.)

P.L. 95-598, Bankruptcy Reform Act of 1978

See page 92 STAT. 2549

House Report (Judiciary Committee) NO. 95-595, Sept. 8, 1977

(To accompany H.R. 8200)

Senate Report (Judiciary Committee) NO. 95-989, July 14, 1978

(To accompany H.R.S. 2266)

Dates of consideration and passage

House February 1, September 28, October 6, 1978

Senate September 7, 22, October 5, 1978

The House bill was passed in lieu of the Senate bill after amending its language to contain much of the text of the Senate bill. The Senate report (this page) and the House report (P. 5963) are set out.

(Consult note following text for information about omitted material. Each Committee report is a separate document on Westlaw.)

House Report NO. 95-595

Sept. 8, 1977

Sec. 506. Determination of secured status

Subsection (A) of this section separates an undersecured creditor's claim into two parts—he has a secured claim to the extent of the value of his collateral; he has an unsecured claim for the balance of his claim. 'Value ' does not necessarily contemplate forced sale of liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case. Throughout the bill, references to secured claims are only to the claim determined to be secured under this subsection, and not to the full amount of the creditor's claim. This provision abolishes the use of the terms 'secured creditor' and 'unsecured creditor' and substitutes in their places the terms 'secured claim' and 'unsecured claim.'

Subsection (B) codifies current law by entitling a creditor with an oversecured claim to any reasonable fees, costs, or charges provided *357 under the agreement under which the claim arose. These fees, costs, and charges are secured claims to the extent that the value of the collateral exceeds the amount of the underlying claim.

**6313 Subsection (C) also codifies current law by permitting the trustee to recover from property whose value is greater than the sum of the claims secured by a lien of that property that reasonable, necessary costs and expenses of preserving, or disposing of, the property. The recovery is limited to the extent of any benefit to the holder of such claim.

Subsection (D) permits liens to pass through the bankruptcy case unaffected. However, if a party in interest requests the court to determine and allow or disallow the claim secured by the lien under Section 502 and the claim is not allowed, then the lien is void to the extent that the claim is not allowed. The voiding provision does not apply to claims disallowed only under Section 402(E), which requires disallowance of certain claims against the debtor by a codebtor, surety, or guarantor for contribution or reimbursement.

**6519 Section 502(I) of the House Amendment adopts a provision contained in Section 502(J) of H.R. 8200 as passed by the House but that was not contained in the Senate Amendment.

Section 502(I) of H.R. 8200 as passed by the House, but was not in the Senate Amendment, is deleted as a matter to be left to the bankruptcy tax bill next year.

The House Amendment deletes Section 502(I) of the Senate bill but adopts the policy of that section to a limited extent for confirmation of a plan of reorganization in Section 1111(B) of the House Amendment.

Section 502(J) of the House Amendment is new. The provision codifies Section 57K of the Bankruptcy Act.

Section 503(A) of the House Amendment represents a compromise between similar provisions in the House bill and the Senate amendment by leaving to the rules of bankruptcy procedure the determination of the location at which a request for payment of an administrative expense may be filed. The preamble to Section 503(B) of the House bill makes a similar change with respect to the allowance of administrative expenses.

Section 503(B)(1) adopts the approach taken in the House bill as modified by some provision contained in the Senate amendment. The preamble to Section 503(B) makes clear that none of the paragraphs of Section 503(B) apply to claims or expenses of the kind specified in Section 502(F) that arise in the ordinary course of the debtor's business or financial affairs and that arise during the gap between the commencement of an involuntary case and the appointment of a trustee or the Order for Relief, whichever first occurs. The remainder of Section 503(B) represents a compromise between H.R. 8200 as passed by the House and the Senate amendments. Section 503(B)(3)(E) codifies present law in cases such as Randolph v. Scruggs, 190 U.S. 533, which accords administrative expense status to services rendered by a prepetition custodian or other party to the extent such services actually benefit the Estate. Section 503(B)(4) of the House amendment to the provision contained in H.R. 8200 as passed by the House and deletes language contained in the Senate amendment providing a different standard of compensation under Section 330 of that amendment.

Section 505 of the House amendment adopts a compromise position with respect to the determination of tax liability from the position taken in H.R. 8200 as passed by the House and in the Senate amendment.

Section 506(A) of the House amendment adopts the provision contained in the Senate amendment and rejects a contrary provision as contained in H.R. 8200 as passed by the House. The provision contained in the Senate amendment and adopted by the House amendment recognizes that an amount subject to set-off is sufficient to recognize a secured status in the

holder of such right. Additionally, a determination of what portion of an allowed claim is secured and what portion is unsecured is binding only for the purpose for which the determination is made. Thus determinations for purposes of adequate protection is not binding for purposes of 'cram down' on confirmation in a case under Chapter 11.

Section 506(B) of the House amendment adopts language contained in the Senate amendment and rejects language contained in H.R. 8200 as passed by the House. If the security agreement between **6520 The parties provides for attorney's fess, it will be enforceable under Title II, notwithstanding contrary law, and is recoverable from the collateral after any recovery under Section 506(C).

Section 506(C) of the House amendment was contained in H.R. 8200 as passed by the House and adopted, verbatim, in the Senate amendment. Any time the trustee or debtor in possession expends money to provide for the reasonable and necessary cost and expenses of preserving or disposing of a secured creditor's collateral, the trustee or debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party.

Section 506(D) of the House amendment is derived from H.R. 8200 as passed by the House and is adopted in lieu of the alternative test provided in Section 506(D) of the Senate amendment. For purposes of Section 506(D) of the House amendment, the debtor is a party in interest.

Section 506(A)(3) of the House amendment represents a compromise dollar amount and date for the priority between similar provisions contained in H.R. 8200 as passed by the House and the Senate amendments. A similar compromise is contained in Section 5507(A)(4).